[No. D019082. Fourth Dist., Div. One. May 27, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS JOHN HEILMAN, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I and III.

COUNSEL

Alisa M. Weisman, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont and Janelle B. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HUFFMAN, Acting P. J.—After months of harassing his ex-girlfriend, appellant Thomas John Heilman went to her place of employment in a rental car and waited for her to arrive. When the hapless victim arrived, Heilman confronted her with a loaded pistol, shot her in the stomach at point-blank range, ripped the public phone from the wall so she could not call for help, and fled.

Following a court trial, Heilman was convicted of first degree murder with the use of a firearm (Pen. Code,[2] §§ 187, 189, and 12022.5, subd. (a)), violating a court order (§ 273.6, subd. (a)), and stalking (§ 646.9).

Heilman appeals, contending the evidence is insufficient to support his first degree murder conviction, that the stalking statute is unconstitutionally vague, and that the standard of reasonable doubt expressed in section 1096 is unconstitutional. We find his contentions wholly without merit and affirm.

### STATEMENT OF FACTS

On September 9, 1992, Heilman waited for Janice Davis to arrive at her place of employment at the Sorrento Towers office building in San Diego. Heilman encountered Davis in an elevator while she was on her way to the office. Heilman placed a .38-caliber pistol into her midsection and shot her. When Davis attempted to use the telephone nearby, Heilman ripped it out of the wall and fled.

Janice Davis and Heilman dated off and on for three or four years. Before she became involved with Heilman, Davis had a relationship with Rodney Rodriguez. Although Davis and Rodriguez dissolved their romantic relationship, they remained close friends and continued shared living arrangements in Pacific Beach.

---

[2] All statutory references are to the Penal Code unless otherwise specified.

In February 1992 Davis was hired by Linda Fernandez as an assistant in the commercial underwriting office of the Reliance Insurance Company in the Sorrento Towers office complex. Fernandez and Davis shared a desk. In June 1992, by the time of the breakup of the relationship between Heilman and Davis, Davis was reporting to Fernandez about constant problems she was having with Heilman. Heilman frequently placed unwanted phone calls to Davis at her office.

Rodney Rodriguez testified that after the breakup of the relationship between Davis and Heilman, Heilman attempted to renew the relationship. This occurred several times. The final breakup of the relationship was in June 1992. Thereafter, Heilman left angry and profane telephone messages at Davis's residence.

On July 20, 1992, Davis spoke to Monika Kimbrough, a security guard at Sorrento Towers. Davis told Kimbrough that she was afraid of her ex-boyfriend, who was harassing her. After the meeting, Kimbrough prepared reports containing photographs of Heilman and distributed them to the building management and security personnel. After the meeting, Kimbrough escorted Davis to work from the parking lot on a daily basis and the building engineer offered to escort Davis around the office building.

Beginning with the June 1992 breakup, Heilman began a pattern of showing up at Davis's car while she was at work. He was noticed by Monika Kimbrough on several occasions, each time driving his truck quickly out of the parking structure.

Heilman left a series of threatening notes for Davis. Davis showed Kimbrough one of the notes which read, "I'm going to make your life miserable." Davis was frightened as a result of receiving the note. A week later she showed Kimbrough another note which read, "If I can't have you, nobody will."

In July or August 1992, Davis showed Rodriguez two notes Heilman had left on her car. One note read, "In my eyes now you're just another lying bitch and nothing more," and "I'm going for an AIDS test and you better pray, and I mean pray, the results are negative." The other note was a reference to Davis's former husband, Frank, who had come to Davis's place of employment in the past with a gun and who had committed suicide. The note read, "I'm beginning to wish Frank had found you that day."

Rodriguez testified Heilman left other notes for Davis which she tore up. In July 1992 Rodriguez saw the following words scribbled in mustard on the windshield of Davis's car, "You lying herpes slut whore."

One or two weeks after Heilman scribbled the words in mustard on Davis's car, Rodriguez saw a beer bottle covered with a condom and ketchup on the hood of Davis's car. He saw "spit" on the driver's side window of the car.

On another occasion in July, Heilman telephoned Rodriguez and asked for Davis. Rodriguez lied, saying Davis was not home. Heilman said he knew Rodriguez was lying because he, Heilman, was outside the residence at the time. Shortly thereafter, Heilman came to the door, pounded on it loudly, and demanded the return of items he had given Davis.

A neighbor heard the loud noises from the apartment. She described a man's voice coming from someone who was very angry, frustrated and violent. The neighbor, who had been awakened by the shouting, threatened to call the police. Heilman told her, "Fuck you, bitch. I'll get you, too."

Shortly before the murder, Heilman damaged Davis's car by placing super glue on the gasoline cap, the driver's door lock and the passenger's door lock. On August 10, 1992, Davis obtained a restraining order against Heilman. After she obtained the restraining order and served it on Heilman, he again showed up at her residence. She told him, "Get away. I've got a restraining order. You can't be here." Davis told Fernandez Heilman drove away after her statements. Shortly thereafter, Davis moved to a new residence which she kept secret from Heilman.

On September 8, 1992, the day before the murder, Heilman answered a newspaper advertisement for the rental of single garages in North Park. Heilman signed a rental application falsely identifying himself as "Tom Johnson" and gave a false residential address in the North Park area. The location of the rented garage was about eight miles from Heilman's residence in Clairemont. Heilman left his truck at that location and rode away on a bicycle.

Around 8 a.m. on September 9, the day of the killing, an electrician at Sorrento Towers heard sounds of a desperate frantic woman crying and begging, saying, "Someone please help me." Within five seconds, he heard a loud gunshot. He went to the area and found a woman a couple of feet from the elevator door.

Around 8 a.m. Daniel Austin arrived at Sorrento Towers to go to work. He saw Heilman dressed in a brown business suit running from the elevator area of the east tower. At the same time Austin heard a woman screaming for help. The woman repeatedly said, "Help me. I've been shot. Oh, God, it hurts. Oh, God, please don't let me die."

Austin approached the woman, had her lie down, and placed a briefcase underneath her head and called for help. He smelled gunpowder in the immediate area. He attempted to use a nearby pay phone, but was unable to as the phone had been yanked out of place. Austin used another telephone nearby to call for help.

The woman told Austin her ex-boyfriend, Tom Heilman, had shot her. She said he had "stuck the gun into her stomach and pulled the trigger."

Davis also told Stephen Sparks she had been shot in the stomach by her ex-boyfriend and that Heilman had disabled the phone so that she could not call for help.

Davis was taken by ambulance to Scripps Memorial Hospital. She was in great pain and pointed to her stomach area and told the trauma nurse, "My ex-boyfriend shot me point blank." Her last words before going under the anesthesia were, "Please don't let me die."

Physical evidence at the bullet wound suggested the bullet was fired from very close range. The bullet traveled essentially from front to back and exited the back of Davis's body. Janice Davis died following surgery as a result of the gunshot injuries.

Heilman was arrested on the day of the shooting. He was stopped and detained while driving a rental car near the garage where his own truck had been parked. Heilman's truck was inside the garage. The police found a briefcase inside the truck and inside the briefcase they found bullets. The police also found a jacket inside the truck which matched the business suit pants Heilman was wearing at the time he was arrested.

*Defense*

Heilman was a courier truck driver prior to the crime. He was described by his supervisor as a good worker, although someone with a "temper." His supervisor noticed Heilman was depressed about trouble with his girlfriend. The supervisor testified that in the second week of August, after Davis obtained the restraining order, Heilman quit his job, saying he wanted to leave San Diego as a result of emotional problems stemming from his relationship with his girlfriend. The supervisor noticed Heilman had lost weight and did not appear to be getting enough sleep. At some point, Heilman made a threat about Davis to his supervisor. He said Davis had told him she had acquired immunodeficiency syndrome. Heilman said he would "get her before the AIDS do."

One of Heilman's friends described him as deteriorating in his physical appearance after the breakup with Davis. The friend did not believe Heilman

had a worse temper than most other people. He testified that during the summer of 1992 Heilman acted in a strange manner, drove at excessive speeds, and had a strange facial expression at times. Heilman was using drugs at the time and told his friend that he quit his job because he was not making enough money. Heilman also said that he felt there was not much of a life for him and he wanted to return home.

Heilman's brother-in-law testified Heilman was very distraught over the breakup with Ms. Davis. He testified Heilman's family was concerned he might commit suicide.

On September 9, 1992, the day of the murder, Heilman got up shortly after 6 a.m. He showered, dressed in suit pants, a tie and shirt, and left the house around 6:50. Heilman left a note for his roommate saying, "Tanya, if I'm not back, thanks for being a good roommate. Take care of Baron [appellant's dog] until someone come gets [sic] him." He left a small amount of money and was not carrying any luggage when he left. The roommate thought Heilman might be contemplating suicide.

Heilman testified in his own behalf. He said that in August he decided he was going to kill himself. He stole a gun from a friend's home and in late August or September bought ammunition for the gun.

Heilman testified he rented a garage for his truck on September 8 so that no one would see him kill himself. He filled out the rental form using entirely false information so that his suicide would not be quickly discovered. On the night before the shooting, Heilman said he left his truck in the garage and rode away on his bicycle. He said he drove the rental car to the garage and took the gun with him, and although he contemplated suicide that night in the rental garage, he decided to drink all night instead.

The next morning Heilman awoke at 5 a.m. and dressed nicely so that he would look appropriate when he died. He left a note for his roommate about taking care of his dog. However, instead of driving to the rented garage, Heilman decided to drive to the Sorrento Towers to say goodbye to Davis and tell her he was going to kill himself. He wanted to confront her once more about their breakup.

Heilman testified he saw Davis walk into the elevator. He approached her without her knowledge with a gun in his pocket. Davis became upset when she noticed him and they argued. Heilman made accusations to Davis, who threatened to call the police and walked to the telephone. Heilman said he

pulled the telephone out of the wall to prevent her from calling the police. Heilman then threatened to kill himself, just as Davis's former husband had done. Davis told appellant to go ahead. Heilman said that when he pulled out the gun he fumbled with it and the gun went off. Heilman said he next saw Davis on the ground. He then left the elevator and the building. He took the gun in the rental car and drove toward the area of San Diego State University, where he threw the gun away somewhere in the midpart of the city.

Additionally, Heilman called expert witnesses who testified concerning his mental condition, his personality, and the effects of alcohol consumption on his state of mind.

## DISCUSSION

### I*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II

▆▆▆ Heilman contends his conviction under section 646.9, subdivision (a) must be reversed because the statute is unconstitutionally vague. At the time of the offenses, section 646.9 provided as follows:

"(a) Any person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear of death or great bodily injury is guilty of the crime of stalking . . . .

"․ . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(d) For the purposes of this section, 'harasses' means a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, or harasses the person, and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person. 'Course of conduct' means a pattern of conduct composed of a series of acts over a period of time,

---

*See footnote 1, *ante*, page 391.

however short, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of 'course of conduct.' "[3] Heilman bases his constitutional claim on the vagueness of the term "repeatedly."

 A fair reading of section 646.9, leads us to conclude that the stalking statute addresses two distinct behaviors, only one of which depends upon our interpretation of the term "repeatedly." Under the statute, one can be penalized either for willful, malicious, *repeated following* or willful, malicious harassment.[4] Subdivision (d) specifically defines the phrase harassment to mean a "course of conduct" which in turn is defined as "a series of acts over a period of time, however short, evidencing a continuity of purpose" in order to delineate the number of instances and time frame of contacts required to constitute harassment. Necessarily then, harassment includes multiple acts. Thus, reading the statute so that "repeatedly" modifies "harasses" as well as "following" would require perpetrators to engage in a repeated series of acts over a period of time evidencing a continuity of purpose before being guilty of a stalking misdemeanor. Such a reading is inconsistent with the intent of the statute to penalize a single course of conduct of harassment. We conclude, therefore, "repeatedly" modifies "following" and not "harassment." Accordingly, even if we were to agree with Heilman's claim that "repeatedly" is a vague term, such a conclusion would not affect a conviction under the willful and malicious harassment provision.

 The record contains substantial evidence to support Heilman's stalking conviction based on a harassment theory. Trial testimony suggested Heilman placed frequent unwanted phone calls to Davis at work. He showed up at Davis's workplace and left threatening notes on her car. He also wrote threatening messages with mustard on her car windshield. He appeared at her home and displayed violent behavior. Finally, Heilman damaged Davis's car by placing super glue on the gasoline cap and the door locks.

 Even if Heilman was convicted under the willful, malicious and "repeated" following provision of the statute, his conviction still survives constitutional attack. Heilman bases his constitutional challenge on the phrase "repeatedly." Since the statute does not provide a separate definition of the word repeatedly, Heilman contends the statute is unconstitutionally vague. We disagree.

---

[3] 1992 and 1993 amendments have added additional provisions to section 646.9. (See Stats. 1992, ch. 627, § 1 and Stats. 1993, ch. 581, § 1.) Neither amendment affects Heilman's constitutional challenge.

[4] Heilman's only constitutional challenge is to the term "repeatedly." Therefore, we assume all the other terms and definitions meet constitutional requirements.

■ The standards by which we are to determine the constitutionality of a challenged statute are well established. "Due process 'requires a statute to be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt. [Citations.]' [Citation.]" (*People* v. *Martin* (1989) 211 Cal.App.3d 699, 705 [259 Cal.Rptr. 770, 86 A.L.R.4th 383].) " ' "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential element of due process of law." [Citation.]' [Citation.]" (*Ibid.*)

" 'A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language.' [Citation.]" (*Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 143 [253 Cal.Rptr. 1, 763 P.2d 852].)

"The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding. [Citations.]" (*Smith* v. *Peterson* (1955) 131 Cal.App.2d 241, 246 [280 P.2d 522, 49 A.L.R.2d 1194].) ■ "Repeatedly" is a word of such common understanding that its meaning is not vague. It simply means the perpetrator must follow the victim more than one time.[5] There is nothing mysterious or ambiguous about the term "repeatedly" to lead an actor to reasonably believe he will not be subject to the penalty under the statute if he engages in willful, malicious following on more than one occasion.

"Repeatedly" as used in this statute is not so vague as to create the danger of arbitrary and discriminatory enforcement of the law. (See *People* v. *Mirmirani* (1981) 30 Cal.3d 375, 382 [178 Cal.Rptr. 792, 636 P.2d 1130].) In fact, "repeatedly" adds to the restraint police officers must exercise. Not until a perpetrator follows a victim more than once does the conduct rise to a criminal level. In addition, the statute provides several other restraints on arbitrary and discriminatory enforcement. First, the perpetrator must be found to have followed or harassed the victim within the meaning of the

[5]This commonsense definition has been adopted by several states enacting statutes similar to section 646.9. (See Ill. Compiled Stat., ch. 725, § 112A-3 [perpetrator must follow victim on two separate occasions]; Colo. Rev. Stat., § 18-9-111 [" 'repeatedly' means on more than one occasion"]; Haw. Rev. Stat., § 711.1106.5(2) [must occur on more than one occasion]; Iowa Admin. Code, § 708.11 [same]; N.C. Gen. Stat., § 14-277.3 [same]; Va. Code Ann., § 18.2-60.3 [same].) In addition, the commonsense definition is consistent with the dictionary definition: "said, done or presented again." (Webster's Third New Internat. Dict. (1981) p. 1924.)

statute. The perpetrator must also have communicated a credible threat. This threat must be made with the specific intent to place the victim in a reasonable fear of death or great bodily harm. Thus, it is clear that it is the perpetrator's intent, rather than the definition of the conduct engaged in, which triggers the applicability of the statute. (See *Screws* v. *United States* (1945) 325 U.S. 91, 101 [89 L.Ed. 1495, 1502-1503, 65 S.Ct. 1031, 162 A.L.R. 1330] [recognizing that the requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid]; *Boyce Motor Lines* v. *United States* (1952) 342 U.S. 337, 342 [96 L.Ed. 367, 372, 72 S.Ct. 329] [requirement of culpable intent element defeats argument that law enforcement would unfairly apply regulation].) The intent element of section 646.9 ensures law enforcement officials do not have boundless discretion in defining the crime. Therefore, we conclude the commonsense term "repeatedly" when read in light of the entire statute is not unconstitutionally vague.

III*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Froehlich, J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 25, 1994.

---

*See footnote 1, *ante*, page 391.