[No. B089024. Second Dist., Div. Four. Jan. 31, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM M. McCLELLAND, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.B. and II.C.

**COUNSEL**

Lawrence C. Hersh, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Pamela C. Hamanaka, Sanjay Kumar and Robert W. Hicks, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RUBIN, J.**[*]—Defendant William M. McClelland was convicted following a court trial of one count of stalking based on behavior that was prohibited by a restraining order. (Pen. Code, § 646.9, subd. (b).)[1] The court also found to be true a prior conviction for attempted murder, making the conviction a second strike. (§ 667, subds. (b)-(i).) Defendant was sentenced to the midterm of three years doubled, for a total of six years. A section 667.5, subdivision (b) prior prison commitment enhancement was stricken.

---

[*]Judge of the Santa Monica Judicial District sitting under assignment by the Chairperson of the Judicial Council.

[1]Section 646.9 provides in part: "(a) Any person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family, is guilty of the crime of stalking, punishable by imprisonment in a county jail for not more than one year or by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment, or by imprisonment in the state prison. [¶] (b) Any person who violates subdivision (a) when there is a temporary restraining order, injunction, or any other court order in effect prohibiting the behavior described in subdivision (a) against the same person, shall be punishable by imprisonment in the state prison, for two, three, or four years."

All further references are to the Penal Code.

Defendant contends section 646.9, subdivision (b) is unconstitutionally vague and also that there was insufficient evidence to support his conviction. He further asserts that he was improperly sentenced because the prosecution failed to allege the prior conviction as a strike. He also attacks the three strikes law on a variety of other grounds. Finally, he argues that the court failed to determine whether he had the ability to pay a $200 restitution fine, and that the abstract of judgment should be corrected to reflect the court's finding as to the prior conviction.

In the published portion of our opinion, we conclude that section 646.9 is not unconstitutionally vague and that there was substantial evidence to support the judgment. In the unpublished portion, we conclude that defendant was properly sentenced. Accordingly, we affirm. We agree that the abstract of judgment does not accurately reflect the trial court findings, and should be modified.

## I.

### *Factual Summary*

#### A. *Events Prior to June 21, 1994*

Viewed in accordance with the usual rules on appeal (*People* v. *Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence establishes that defendant and the victim, Monica Erdman, began dating in 1982. At the time, defendant was married to another woman. Erdman eventually learned of defendant's marriage, his divorce, and of his being convicted and sentenced to state prison for attempting to murder his former wife by burning down her house. Erdman continued to date defendant during this period and eventually married him in Tehachapi State Prison in 1988.

When defendant was released in 1990, he went to live with Erdman. Shortly thereafter, she saw him strike her daughter, Linda, after a minor argument. When Erdman threatened to call the police, defendant left the home and lived elsewhere for several months. They later reconciled. By the end of 1993, the relationship had significantly deteriorated, and Erdman suspected that defendant was in love with Linda, who was away at college. Defendant had sent Linda a series of letters which at first expressed his love for her but which eventually turned abusive. In one, defendant stated that if he had seen someone " 'blow [Linda's] head off,' " he would " 'spit on [her] carcass.' "

In January 1994, Erdman discovered a partially dissolved yellow tablet in a coffee mug from which Linda had been drinking. She found several

similarly shaped tablets floating in the toilet. When she confronted defendant, he punched Erdman square in the face, causing her nose to bleed profusely. Defendant then ran into the living room, pinned Linda down to the floor, and punched her several times in the head. Defendant then took Erdman's keys and left in her car. A few days later, at defendant's request, the three met at a supermarket parking lot. Defendant advised Erdman that he had withdrawn $2,500 from their joint checking account and had used the money to put a "hit" on Erdman, her children and her house.

During January through the middle of June 1994, defendant made repeated threats to Erdman, Linda and other family members, and specifically threatened to burn down Erdman's house. On June 18, 1994, while Erdman was at a party for her granddaughter, defendant tried to remove belongings from the house. When Erdman returned, he said he should have shot Linda in the head, "better yet, [I] could have gotten three for the price of one." Defendant then took a book of matches, lit one, and asked Erdman if she knew "what they were for." She understood defendant's conduct as a threat to burn down her house.

### B. *The June 21, 1994, Order and Subsequent Events*

On June 21, 1994, Erdman served defendant with a temporary restraining order.[2] The order prohibited defendant from returning to the house, and from contacting, molesting, attacking, striking, threatening, sexually assaulting, battering, telephoning or disturbing the peace of Erdman, Linda, and certain identified family members. Defendant was ordered to stay at least 100 yards away from Erdman and the other members of the family.

After being served with the order, defendant repeatedly telephoned Erdman. When she used her answering machine to screen calls, defendant yelled at her to pick up the phone and not be a coward. During the 13 days between June 29 through July 11, 1994, the period covered by the information, the following events took place:

—On June 29, defendant rammed the front gate of Erdman's house with his car.

—On June 30, defendant arrived unannounced with two policemen to retrieve his belongings. Defendant left without incident but later telephoned

---

[2]The proof of service on the temporary restraining order states that the "person served" was one Richard Moreno. This apparently was an error since Mr. Moreno's signature on the proof of service indicates he was the person *serving* the order. Erdman testified that she had a friend serve defendant on June 21, 1994, a fact defendant admitted at trial and his counsel conceded in his opening brief.

the house and stated "Fire bomb at 6:00 o'clock." Erdman believed defendant had planted a bomb in the house and called the police; no bomb was found.

—Throughout the long holiday weekend starting June 30, defendant repeatedly called Erdman. She testified there were "numerous, numerous calls, very vile, calling me, my children names."

—On July 3, Erdman saw defendant drive up to the house, jump out of the car and threw what she believed to be an explosive device at the house. When the object struck the house it "went off like an explosive." Police investigating the incident determined that the object was a partially filled green soda bottle.

—On July 11, Erdman observed defendant's car parked in front of the house; she was afraid that he was on the property. She called the police, who arrested defendant one-half mile away.

On July 7, 1994, the court held a hearing on the order to show cause issued with the June 29, 1994, temporary restraining order. The court granted a "Restraining Order after Hearing" in essentially the same form as the temporary restraining order. The written order was dated and filed on August 25, 1994.

## II.

### *Discussion*

#### A. *Stalking Issues*

##### 1. *Constitutionality of Section 646.9, subdivision (b).*

Defendant's principal contention is that section 646.9, subdivision (b) is unconstitutionally vague and, therefore, his conviction must be reversed. We find no merit in this argument.

Section 646.9, subdivision (a) provides in part that anyone who "willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety" is guilty of stalking. Stalking under subdivision (a) is punishable as a misdemeanor or felony. Subdivision (b) provides that when the proscribed behavior is the subject of a restraining order, the crime is a felony.

Defendant does not contend language in section 646.9, subdivision (a) is vague, nor could he. *People* v. *Heilman* (1994) 25 Cal.App.4th 391, 400-401 [30 Cal.Rptr.2d 422], has previously determined the phrase "repeatedly follows" is not unconstitutionally vague; the terms "harasses" and "credible threat" are defined in detail in section 646.9, subdivisions (e) and (g), respectively; and "willfully" and "maliciously" have been part of the Penal Code lexicon since 1872. (See 47 West's Ann. Pen. Code (1988 ed.) § 7, at p. 18.) Rather, defendant argues that it is "unclear from the language of subdivision (b) exactly what behavior in [sub]division (a) must be actually proscribed by the court order in order for a defendant to have violated subdivision (b)."

The standards by which we are to determine the constitutionality of a challenged statute are well established. ■ " 'Due process "requires a statute to be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt. [Citations.]" ' (*People* v. *Martin* (1989) 211 Cal.App.3d 699, 705 [259 Cal.Rptr. 700, 86 A.L.R.4th 383].) ' " "[A] statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential element of due process of law.' [Citation.]" ' (*Ibid.*) [¶] ' "A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." [Citation.]' (*Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 143 [253 Cal.Rptr. 1, 763 P.2d 892].)" (*People* v. *Heilman, supra,* 25 Cal.App.4th at p. 400.)

■ Defendant contends section 646.9, subdivision (b) can be interpreted in at least five different ways in ascertaining whether the underlying restraining order proscribes behavior described in subdivision (a). For example, he argues, the statute could be interpreted so that the restraining order must "mirror" the "harasses," "follows," "threat" language of subdivision (a). Or, it could be interpreted so that the order may proscribe some but not all of the behavior described in subdivision (a). The conclusion which defendant asks us to reach is that since there are many different interpretations of the statute, defendant has not received adequate notice of what conduct is prohibited.

Defendant's major premise is incorrect. He posits that the statutory scheme requires a comparison of the language of the restraining order with the language of subdivision (a). We discern no such mandate in the statute. ■ "The ' "fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. . . ." " . . . In determining this intent, courts look first to the words contained in the statute, giving them their usual and ordinary meaning.' . . . '[T]he various

parts of the statutory enactment must be harmonized by considering the particular clause in the context of the whole statute.' . . . ' " 'Language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend.' " ' . . . 'Statutory language must be read in context, keeping in mind the nature and purpose of the enactment, and must be given such interpretation as will promote rather than defeat the objective of the law. . . . In ascertaining legislative intent, not only the statutory language should be considered; we should also take into account the object of the legislation, the evils to be remedied, the legislative history, public policy and other matters helpful in discerning the intended meaning of the words used.' " (*People* v. *Carron* (1995) 37 Cal.App.4th 1230, 1236 [44 Cal.Rptr.2d 328], citations omitted.)

Applying these principles, it is true that section 646.9, subdivisions (a) and (b) are to be read together. However, it is not the language of subdivision (a) and the language of the restraining order which must be harmonized; it is that defendant's *behavior* must have violated both subdivision (a) and the order. If the defendant's conduct constitutes repeated following or harassment (*People* v. *Heilman, supra,* 25 Cal.App.4th at p. 399) and defendant has made a credible threat, then defendant has violated subdivision (a). If the same conduct is also prohibited by an existing restraining order against the defendant, then the defendant has violated subdivision (b). Thus, subdivision (b) serves the manifest legislative purpose of providing enhanced punishment to those stalkers who have been ordered to refrain from such conduct in civil proceedings, and, hence, have been warned that their behavior is unacceptable. We conclude subdivision (b) adequately informed defendant of the conduct which was proscribed.

### 2. *Sufficiency of the Evidence.*

■ Defendant contends there was insufficient evidence to support the judgment. The familiar standard is that this court must decide only whether there is substantial evidence in the record to support the determination of guilt made by the trier of fact. (*People* v. *Ochoa, supra,* 6 Cal.4th at p. 1206.) We conclude the trial court reasonably found that: (1) defendant's conduct constituted harassment and he made a credible threat under section 646.9, subdivision (a); and (2) defendant's actions violated the underlying restraining order.

The information alleges that it was defendant's conduct between June 29 and July 11, 1994, that constituted stalking.[3] The evidence was that on different days during that period defendant rammed into the front gate of Erdman's house with his car; he telephoned her, stating, "Fire bomb at 6:00 o'clock"; he called Erdman and her children "vile names"; he threw what appeared to Erdman to be an explosive device at her home; and he left his car in front of her property.

The trial court found that defendant stalked Erdman by harassing her and making a credible threat. Harassment, under the statute, means a knowing and willful course of conduct that seriously alarms, annoys, torments or terrorizes a person and which serves no legitimate purpose. (§ 646.9, subd. (e).) "Course of conduct" is defined as a series of acts over a period of time, however short. (§ 646.9. subd. (f).) Substantial evidence supported a finding of defendant's guilt on a harassment theory. (See *People* v. *Heilman*, *supra*, 25 Cal.App.4th at p. 399 [harassment consisted of frequent unwarranted calls, appearing at victim's workplace, leaving threatening notes on victim's car, displaying violent behavior, placing super glue on victim's car].)

There was also substantial evidence that defendant made a credible threat with the intent to place Erdman in reasonable fear for her safety. Under section 646.9, subdivision (g), a credible threat may be written, verbal, one "implied by a pattern of conduct," or a combination of the above. Defendant's statement, "Fire bomb at 6:00 o'clock," expressly threatened the safety

[3]There was evidence of assaults, threats and other conduct directed toward Erdman and her family members both before and after the period in question. This evidence came in without objection. It was offered to give context to defendant's actions during the period covered by the information, and to explain why Erdman understood defendant's statements and conduct to be threats. Respondent does not argue that defendant's conduct outside the information period constitutes part of the crime charged.

Defendant contends that evidence of defendant's car being parked in front of Erdman's property on July 11, 1994, should be disregarded since there was no order in effect on that date. The temporary restraining order was issued June 21, 1994, and expired on July 7, 1994. On July 7th, the court held a hearing on Erdman's application for a permanent restraining order. That order was granted, but it bears a signature date and a filing date of August 25, 1994, which, according to defendant, means no order governed his conduct on July 11th.

The final order, however, recites that the hearing took place on July 7, 1994, and that, because both defendant and Erdman were present, no proof of service was necessary. The final order expired on July 7, 1997, three years following the July 7, 1994, hearing. Three years is the maximum duration of such an order. (See Fam. Code, § 6345; Code Civ. Proc., § 527.6, subd. (d).) These facts are consistent with the final order having been issued on July 7, 1994, even though it was not signed or filed until August 25, 1994. To the extent the trial court considered the July 11, 1994, incident in determining guilt, we must assume it impliedly found that the final order was in effect from July 7, 1994. We will not disturb implied findings supported by the evidence. (See *People* v. *Superior Court (Hartway)* (1977) 19 Cal.3d 338, 350, fn. 6 [138 Cal.Rptr. 66, 562 P.2d 1315].) However, even if we were to disregard the July 11th incident, the evidence was sufficient to support the judgment.

of Erdman and her family. A reasonable person, aware that defendant had been convicted of attempted murder in burning his former wife's house, would reasonably fear for her safety upon hearing such a remark. The vicious names he called Erdman and her children coupled with his other actions during the period in question also constituted threats implied by conduct. It is immaterial that defendant may not have actually intended to carry out these threats. (*People* v. *Carron*, *supra*, 37 Cal.App.4th at p. 1239.)[4]

Defendant argues that there was insufficient evidence that he had the "apparent ability" (§ 646.9, subd. (g)) to carry out the threat. The circumstances leading to defendant's attempted murder conviction, his threatening display of matches to Erdman, his throwing of a bottle at the house, and his overall behavior during the period in question, constituted substantial evidence of his apparent ability to carry out the threat, "Fire bomb at 6:00 o'clock."

There was also substantial evidence that defendant's behavior violated the restraining orders. Defendant's conduct in threatening, contacting and telephoning Erdman all violated express prohibitions contained in the court orders. Defendant admitted during the trial that his actions were "annoying" to Erdman. Thus, defendant impliedly conceded that his conduct violated that part of the order which prohibited defendant from molesting Erdman. " 'Annoy and molest' are synonymous and mean to disturb or irritate, especially by continued or repeated acts; to vex, to trouble; to irk; or to offend. [Citations.]" (*People* v. *Kongs* (1994) 30 Cal.App.4th 1741, 1749 [37 Cal.Rptr.2d 327].)

Finally, defendant argues that since it is possible to violate section 646.9, subdivision (a), but not violate the order, "the condition precedent" to finding a conviction under subdivision (b) was not met. Although it is difficult to imagine such a scenario in this case, defendant's point misses the mark for a more fundamental reason. If conduct violates subdivision (a) but not (b), then a conviction under subdivision (a) lies. If the converse is true, a conviction under section 273.6 (violation of a domestic violence or civil harassment restraining order) or section 166, subdivision (a)(4) (violation of court order) lies. Where, as here, the conduct violates both subdivision (a) and a restraining order, a violation of section 646.9, subdivision (b) occurs.

---

[4]After the events giving rise to the instant prosecution, the Legislature amended section 646.9, subdivision (g) to codify the holding in *People* v. *Carron*, *supra*, by adding "It is not necessary to prove that the defendant had the intent to actually carry out the intent." (Stats. 1995, ch. 438 (Assem. Bill No. 985), § 2.)

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III.

### *Disposition*

The judgment is affirmed. The clerk of the superior court is directed to correct the adstract of judgment by striking the language in paragraph 4 and substituting therefor language reflecting that the court found to be true the allegation of a prior conviction under Penal Code section 667, subdivision (e)(i).

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied February 28, 1996, and on February 16, 1996, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 17, 1996.

---

*See footnote, *ante*, page 144.