Filed 4/29/14  P. v. Plyant CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>SUSAN VERONICA PYLANT,<br><br>　　　Defendant and Appellant. | A133507<br><br><br>(Solano County<br>Super. Ct. No. VCR210865) |

Defendant Susan Pylant was charged with stalking John Mason in disregard of a previously issued restraining order, in violation of Penal Code section 646.9, subdivision (b).[1]  After a jury found defendant guilty, the trial court sentenced her to three years in prison, with 268 days of credit.

On appeal, defendant contends that the trial court erred by failing to sua sponte instruct the jury on two subjects: first, that defendant had knowledge of the restraining order and intended to violate it, because she claims knowledge and intent are requisite elements of the offense; and second, on defendant's affirmative defense that she lacked knowledge of the restraining order and did not intend to violate the order.  We conclude that both arguments lack merit, and we affirm.

---

[1] All statutory references are to the Penal Code unless otherwise noted.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

John Mason described his relationship with defendant as "stormy from the beginning," a fitting description given the clouded factual history the two provided at trial. According to Mason, he first met and started dating defendant in February 2009. Shortly thereafter, in March or April, defendant, who was homeless at the time, moved in with Mason at his rental home in Vallejo, where he had been living for twenty-two years. Defendant testified that the relationship was significantly longer, claiming that she lived with Mason for five years, rather than the two years as testified by him. Defendant also claimed that she moved in with Mason the same day she met him. While similar factual disputes continue throughout the record, it is clear that the relationship ended on April 14, 2011, when defendant was arrested and charged under section 646.9, subdivision (b), for stalking Mason in disregard of a previously-issued restraining order. (§ 646.9, subd. (b).)

**The Restraining Order**

Regardless of when it actually began, by June 2010 the relationship between defendant and Mason had deteriorated significantly. Mason testified that at this point defendant was living "off and on" with him at his home. During periods when they were not living together, defendant would come by Mason's home in the middle of the night demanding money and threatening to burn down the home or break out its windows if Mason did not comply. In early June 2010, defendant followed through with her threats, breaking Mason's bedroom window with a mop handle and, a short time later, twice throwing a brick at his car, which shattered the windshield. With the situation continuing to escalate, Mason attempted to file for a restraining order against defendant on June 12, 2010, but unknowingly failed to appear at the hearing, so his request was denied.

Mason admitted to reconciling with defendant shortly thereafter, letting her back into his home "two or three" more times. Nothing changed during Mason's latest reconciliations with defendant—except that the threats allegedly started getting worse, which caused Mason to become scared for his own well-being. According to Mason, defendant was becoming "more and more violent all the time." Additionally, defendant started stealing and ransoming Mason's property for money. Twice, for instance,

2

defendant snatched Mason's $300 glasses off of his face, on one occasion drawing blood. Defendant also stole Mason's denture, which he valued at $4,000. Mason testified that "the whole thing was for me to give [defendant] money and if I didn't do it what she would try to do is [*sic*] take something from me and ransom it back to me. . . . This was an ongoing thing." Alarmed by these actions—including a September 23, 2010 incident where defendant threatened to have her sons shoot him—in October 2010 Mason applied for a second restraining order.

On October 15, 2010, the court granted a two-year restraining order, requiring defendant to stay more than 100 yards away from Mason, his home on Ohio Street, and his place of employment. According to Mason, after the restraining order was issued, he called defendant—who had failed to appear at the hearing—and said he had papers that needed to be served on her. When defendant did not respond, Mason hired a third party to serve the papers. After the restraining order was served on defendant, Mason filed the proof of service at the courthouse in Fairfield, and filed copies of the restraining order with the Sheriff's Department in Fairfield and the Vallejo Police Department.

The restraining order failed to prevent defendant from returning to Mason's home, which gave rise to the present case.

**The First Arrest**

Even after the restraining order was issued, Mason continued to have contact with defendant, again admitting to reconciling a "couple of times," describing defendant as "quite convincing in talking me into taking her back." Viewing himself as an old man in search of his "last shot at romance," Mason continued to let defendant "back in, and back in, and back in." Specifically, in January or February of 2011, Mason allowed defendant to move in; this lasted about a week and then defendant "disappear[ed] again." Defendant, however, would later show up in the middle of the night and knock on Mason's door at two or three o'clock in the morning. This erratic behavior continued, so Mason finally made clear to defendant that she was no longer welcome at his home and even built a picket fence around his front porch to keep her away from his front door.

3

Defendant still kept coming back. In the early morning of February 24, 2011, Mason called police after defendant showed up at his home accompanied by a new boyfriend, an older man who claimed to be gang member from Los Angeles, and demanded $60 from Mason and her clothing that she had left in his house. Because Mason had already given the clothes to defendant's son, both defendant and her boyfriend eventually left the premises without obtaining the clothes or the money. Nevertheless, later that day defendant returned by herself to Mason's home, whereupon she was arrested for violating the October 2010 restraining order.[2]

Defendant testified that she did not know the October 2010 restraining order was in effect when she was first arrested in February 2011. She claimed that after Mason hired someone to serve her with the order in October, she "went right in [Mason's] house after that, and [Mason] ripped it up." Defendant also admitted "he had another one," but qualified her statement by stating that "he must have put it in his file, but all the time he was making me think he didn't have one."

**The Second Arrest**

Defendant was not deterred by her first arrest for violating the restraining order. After she was released from custody,[3] defendant continued to make phone calls to Mason in the middle of the night, threatening to burn down his home, and forcing Mason to eventually unplug his telephone. On March 9, 2011, defendant returned to Mason's

---

[2] Vallejo Police Officer Douglas Wilcox stated that about noon on February 24, 2011, he was dispatched to a disturbance on Ohio Street. On his way to the call, Officer Pedretti contacted him by radio and said that if defendant was there, she was in violation of the restraining order, so he was to arrest her and bring her to the station. Defendant was on the porch and Wilcox told her she was being arrested for violating a restraining order. Wilcox had been to the house about six weeks earlier when defendant was picking up the clothes Mason had bagged and left on the porch.

[3] At trial, defendant claimed that she was in the Fairfield jail in March 2011 and that Mason picked up her up and brought her to his house. Defendant argues that by picking her up from jail and bringing her to his home, Mason's action led her to again conclude that the restraining order was inoperative. It is unclear, however, whether this incident was related to her arrest for violating the restraining order or if defendant was in jail for another matter.

4

home to ask for her sleeping bag, an incident which Mason said occurred at two o'clock in the morning. Defendant also claimed that she was sleeping in Mason's backyard at this time, in his shed. While she recognized Mason no longer wanted her in his home by this point, defendant testified that she was still unaware of a restraining order against her. In her words, "If I knew that there was really a restraining order, I wouldn't have been going by there. I'm not that stupid. What am I going to keep going back to his house so I can keep going to jail?"

On March 23, 2011, defendant called Mason on the telephone and told him that she had his IRS paperwork, which she had supposedly obtained from the mail carrier on the block. Defendant testified that she took the mail because she wanted to report Mason's alleged gambling to the IRS, "since he wouldn't give [defendant her] money." Defendant then put the mail on his doorstep after she had obtained his birth date and social security number.

On April 14, 2011, the "stormy" relationship between defendant and Mason reached its nadir. Defendant angrily showed up at Mason's front door, attempting to ransom a voltage regulator she had taken from Mason's mail. When defendant threatened to burn down his home, Mason began calling 911. It was at that moment that defendant struck Mason hard on the side of his head with her purse. Defendant then "casually walked off."

Vallejo Police Corporal Robert Herndon was working the desk on April 14, 2011, and took the report from Mason regarding defendant's appearance at his home. Herndon dispatched officers to where defendant was located and defendant was arrested a second time for violating the restraining order. After advising defendant of her *Miranda* rights, which she waived, Herndon interviewed defendant at the jail. Defendant told Herndon that she had gone over to Mason's home to ask him to buy her some clothes. She said that when Mason refused, they got into an argument. Defendant admitted that she took the voltage regulator that had arrived in the mail but said that she eventually gave it back. Defendant also said that during the argument, Mason grabbed her shirt, so she struck him

5

with her purse. Defendant left when Mason called the police, but was later arrested for violating the restraining order, which she claims she did not know was in effect.

**The Jury Instruction on Stalking in Violation of a Court Order**

Defendant was charged with stalking following the issuance of a restraining order under section 646.9, subdivision (b). On July 5, 2011, trial by jury commenced with the Honorable Tim P. Kam presiding. On the afternoon of July 7, 2011, both the prosecution and defense counsel conferred with the court regarding jury instructions. The court specifically reviewed the language of CALCRIM No. 1301, relating to section 646.9, subdivision (b), and neither the prosecution nor defense counsel objected. Accordingly, after closing arguments, the court instructed the jury with CALCRIM No. 1301, stating in relevant part as follows:

"The defendant is charged in Count 1 with stalking in violation of a court order, pursuant to Penal Code section 646.9(b).

"To prove that the defendant is guilty of this crime, the People must prove that: One, the defendant willfully and maliciously harassed or willfully, maliciously, and repeatedly followed another person; two, the defendant made a credible threat with the intent to place the other person in reasonable fear for his or her safety; and, three, a restraining order prohibiting the defendant from engaging in this conduct against the threatened person was in effect at the time of the conduct. [¶] . . . [¶] The terms and conditions of a restraining order remain enforceable despite the parties' actions, and may only be changed by court order."

On July 8, 2011, the jury found defendant guilty of stalking Mason between March 9, 2011 and April 14, 2011, in disregard of a previously issued restraining order. (§ 646.9, subd. (b).) On September 2, 2011, defendant was sentenced to three years in prison, with 268 days of credit.

On October 12, 2011, defendant filed timely notice of appeal.

## DISCUSSION

### I. Defendant Failed to Object to the Jury Instructions

We note at the outset that defense counsel did not object—in fact, expressly agreed to—the language in the jury instructions, including specifically CALCRIM No. 1301. Under section 1259, however, an appellate court may review any instruction given, refused or modified, even though no objection was made in the lower court, if the substantial rights of the defendant were affected thereby. Here, defendant claims that the trial court failed to instruct on knowledge and intent elements of the charged crime, which implicates her substantial rights since she was sentenced to three years in prison. (See *People v. Holmes* (2007) 153 Cal.App.4th 539, 544.) We thus review the defendant's claims.

### II. The Trial Court Properly Instructed on the Elements of a Section 646.9 Violation

As noted, defendant was charged with stalking John Mason in violation of section 646.9, which provides in relevant part:

"(a) Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking, punishable by imprisonment in a county jail for not more than one year, or by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment, or by imprisonment in the state prison.

"(b) Any person who violates subdivision (a) when there is a temporary restraining order, injunction, or any other court order in effect prohibiting the behavior described in subdivision (a) against the same party, shall be punished by imprisonment in the state prison for two, three, or four years."

On appeal, defendant contends that the court committed constitutional due process error by failing to instruct the jury on two requisite elements in section 646.9, subdivision (b), specifically that the defendant first must have knowledge of the restraining order at the time of the commission of the stalking and, second, that the

7

defendant intended to violate the order.  Defendant now challenges CALCRIM 1301 as misstating the law because the language of the instruction does not include any knowledge or intent elements in regard to a violation of a restraining order.

We determine whether a jury instruction correctly states the law under the de novo standard of review.  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088, citing *People v. Posey* (2004) 32 Cal.4th 193, 218.)  In determining whether a trial court properly instructed on the elements of an offense, we consider whether there is a reasonable likelihood the jury applied the challenged instruction in a way that violated the Constitution.  (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.)  Further, "[t]he instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  (*Ibid.*)  Reversal is warranted only if it is reasonably likely that the jury instructions as a whole provided the jury with an inaccurate understanding of the applicable law.  (*People v. Kelly* (1992) 1 Cal.4th 495, 525-526.)  If possible, though, the instruction should be interpreted "so as to support the judgment rather than defeat it if [it is] reasonably susceptible to such interpretation."  (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.)

We begin with the observation that CALCRIM 1301, the instruction about which defendant complains, has been upheld in *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1196-1197—a case defendant does not even mention.

Defendant's main contention is that, while violation of a restraining order may be a straightforward misdemeanor, when it is tied to the crime of stalking, it becomes a felony requiring years of imprisonment, a far more serious offense—and one that defendant claims—demands a heightened burden of proof.  Based on this reasoning, defendant argues that, "under general principles of law," section 646.9, subdivision (b) carries with it "implied scienter and intent elements," such as an awareness that the restraining order was actually being enforced and was linked to the conduct earmarked as "stalking," and, further, an additional intent element to violate the order to consummate the crime.  We disagree.

8

As described by our colleagues in Division Five, section 646.9, subdivisions (b) and (c) are penalty provisions, that is, they do not define separate substantive offenses. (*People v. Muhammad* (2007) 157 Cal.App.4th 484, 493-494.)  Each subdivision merely describes alternate punishments for the single offense of stalking set forth in section 646.9, subdivision (a), depending on the criminal history of the defendant.  (*Id*. at p. 494.)  In the words of *Muhammad*: "Subdivision (a) sets out the elements of the crime of stalking.  Subdivisions (b) and (c), after referring to subdivision (a), focus on the ' " 'criminal history of the defendant which is not present for all such . . . perpetrators and which justifies a higher penalty than that prescribed for [stalking].' " ' "  (*Id*. at p. 493.)  For instance, when a person violates section 646.9, subdivision (a), while there is a restraining order in effect, subdivision (b) is triggered, which establishes the punishment as imprisonment in the state prison for two, three, or four years. (§ 646.9, subd. (b).)

Importantly, in *People v. McClelland* (1996) 42 Cal.App.4th 144 (*McClelland*), the court rejected a claim that subdivision (b) is unconstitutionally vague.  There, following a court trial, the defendant was convicted under section 646.9, subdivision (b), of one count of stalking based on behavior that was prohibited by a restraining order.  (*Id.* at p. 147.)  Defendant contended on appeal that subdivision (b) is unconstitutionally vague because it could be "interpreted in at least five different ways in ascertaining whether the underlying restraining order proscribes behavior in subdivision (a)."[4]  (*Id.* at p. 151.)  Defendant argued that the statutory scheme requires a comparison of the language of the restraining order with the language of subdivision (a).  (*Ibid.*)  The court disagreed.

---

[4] For example, the defendant argued the statute could be interpreted so that "the restraining order must 'mirror' the 'harasses,' 'follows,' 'threat' language of subdivision (a). Or, it could be interpreted so that the order may proscribe some but not all of the behavior described in subdivision (a)." Basically, in arguing that there are many different interpretations of the statute, the defendant claimed he did not receive adequate notice of what conduct was prohibited. (*People v. McClelland*, *supra*, 42 Cal.App.4th at p. 151.)

9

Examining the statutory intent of section 646.9, *McClelland* found that subdivisions (a) and (b) are to be read together. (*McClelland*, *supra*, 42 Cal.App.4th at pp. 151-152.) But it is not the language of subdivision (a) and the language of the restraining order that must be harmonized. Rather, "it is that defendant's *behavior* must have violated both subdivision (a) and the order." (*Id.* at p. 152.) For example, if the defendant's conduct constitutes repeated following or harassment, and the defendant has made a credible threat, then the defendant has violated subdivision (a). If the same conduct is also prohibited by an existing restraining order against the defendant, then the defendant has violated subdivision (b). Thus, by concluding that subdivision (b) adequately informed the defendant of the conduct that was proscribed, *McClelland* explicitly held that "subdivision (b) serves the manifest legislative purpose of providing enhanced punishment to those stalkers who have been ordered to refrain from such conduct in civil proceedings, and, hence, *have been warned that their behavior is unacceptable*." (*Ibid.,* italics added.)

Eschewing all reference to *McClelland*, defendant nevertheless argues here that mere proof that she ran afoul of the order without full mindfulness of the interplay between that order and her underlying offense of stalking was not sufficient to show a violation of subdivision (b), an argument which cites two California Supreme Court cases: *Stark v. Superior Court* (2011) 52 Cal.4th 368 (Stark) and *People v. Garcia* (2001) 25 Cal.4th 744 (Garcia). Neither helps her.

In *Stark* a county auditor-controller was alleged to have violated section 424, an embezzlement statute, with the embezzlement occurring during the course of his official capacity managing public funds, a position that provides a certain level of discretion if his actions are legally authorized. (*Stark v. Superior Court*, *supra*, 52 Cal.4th at p. 376.) The auditor-controller contested his criminal indictment for willful or corrupt misconduct involving public funds by asserting that section 424 requires an intentional violation of a known legal duty, not merely a general intent to perform the proscribed act. (*Id.* at p. 376.) After a thorough analysis of general criminal intent principles, as well as the auditor-controller's responsibilities as a public official dealing with public funds, the

10

court agreed that section 424 requires a broader mental element beyond a mere intent to do the act, because the language of section 424 explicitly states that criminal liability attaches only when the intended act is "contrary to the laws governing the handling of public money." (*Id*. at p. 395.) Put otherwise, the county auditor-controller would have been in violation of section 424 only if he (1) intended to appropriate, transfer, or omit funds *and* (2) knew that those particular actions or omissions were not authorized by law. (*Ibid*.) We find little similarity between *Stark* and the present case.

Section 424 addresses discretionary conduct, which *Stark* found requires an additional knowledge element to overcome the discretionary hurdle. (*Id*. at p. 395.) Furthermore, *Stark* reasoned that section 424 required the broader mental state beyond the intent to do the act because its provisions, "[u]nlike many statutory provisions," make the presence or absence of legal authority part of the definition of the offense. (*Id*. at pp. 395-396.)

To address the glaring fact that she had been served with the restraining order, defendant cites to *Garcia, supra,* 25 Cal.4th 744, which held that a jury "may infer knowledge from notice, but notice alone does not necessarily satisfy the willfulness requirement." (*Id*. at p. 752.) In *Garcia*, the defendant was convicted of willful failure to register as a sex offender under section 290. (*Id*. at p. 747.) Defendant claimed he was unaware of the registration requirement—even though he signed a notice reminding him of his registration obligations when he was released from prison—and that the trial court erred in instructing the jury by failing to make it clear that a "willful" failure to register requires a finding that he actually knew about his duty to register. (*Id*. at pp. 748-751.) Emphasizing the willfulness requirement of section 290, the Court agreed with defendant, finding that, "*in appropriate cases*, knowledge has been held to be a concomitant of willfulness." (*Id*. at p. 752, italics added.) However, the Court specifically limited its holding by noting that, "[i]n a case like this, involving a *failure* to act, . . . section 290 requires the offender to actually know of the duty to act." (*Ibid*.) Here, as even defendant acknowledges, the conduct at issue does not involve a failure to act.

11

Defendant's arguments cannot stand against *McClelland*. (*McClelland*, *supra*, 42 Cal.App.4th at p. 152.)

On October 15, 2010, a two-year restraining order went into effect requiring defendant to stay more than 100 yards away from Mason, his home, and his place of employment. Defendant admitted being served with the order shortly thereafter. And on February 24, 2011, defendant was arrested for the first time in violation of the restraining order. To accept the argument that defendant did not have knowledge of the restraining order after first being served with the order and, second, being arrested for violating that very order, strains credulity. Moreover, an "implied" requirement that defendant must have knowledge of the restraining order at the time of the commission of stalking, as defendant advocates here, would defeat subdivision (b)'s "manifest legislative purpose of providing enhanced punishment to those stalkers who have been ordered to refrain from such conduct in civil proceedings, and, hence, have been warned that their behavior is unacceptable." (*McClelland*, *supra*, 42 Cal.App.4th at p. 152.)

Defendant also contends that Mason acquiesced to contact in disregard of the restraining order and, consequently, the interplay between the order and her underlying offense of stalking was not sufficient to show a violation of subdivision (b). Defendant notes that Mason's testimony was replete with assertions that he only "fitfully enforced" the restraining order and, so the argument runs, by his conduct encouraged defendant to disregard it. Indeed, according to defendant's testimony, Mason's actions went even further: he actually "sabotaged" the order by tearing it up in defendant's presence, telling defendant to disregard it, and supposedly pressuring her to stay in his home or on his premises in direct violation of the order.

Whatever Mason's actions, the bench notes to CALCRIM 1301 specifically state that "[i]f the defendant argues that the alleged victim acquiesced to contact with defendant contrary to a court order, the court may, on request, give the last . . . paragraph stating that such orders may only be changed by the court." (CALCRIM 1301, citing § 13710, subd. (b); *People v. Gams* (1996) 52 Cal.App.4th 147, 151-152, 154-155.) Because the trial court included this last paragraph into its instructions, and further

12

because defendant even concedes that the language correctly states the law, the instructions as a whole gave the jury an accurate understanding of the law. There was no error.

### III. The Trial Court Did Not Have a Sua Sponte Duty to Instruct on Knowledge or Intent as Elements of Defendant's Affirmative Defense

Alternatively, defendant contends that the trial court erred in failing to instruct sua sponte on the knowledge and intent elements because those elements comprised her affirmative defense. Defendant again argues here that she was unaware that the restraining order applied to her and that she acted as she did not to violate the order, but for reasons inherent in the day-to-day structure of her relationship with Mason. While not explicitly stated, we assume defendant is attempting to establish a defense theory based on mistake of fact.

In *People v. Anderson* (2011) 51 Cal.4th 989, the California Supreme Court held that a trial court does not have a sua sponte duty to instruct on a defense that negates or rebuts an element of an offense, as long as the jury "received complete and accurate instructions." (*Id*. at p. 998 [no sua sponte duty to instruct on accident defense; accident theory merely pinpoints defense theory of the case].) Furthermore, *People v. Lawson* (2013) 215 Cal.App.4th 108 held that "the rationale of *Anderson* applies with equal force to the defense of mistake of fact, or any other defense that operates only to negate the mental state element of the crime." (*Id*. at p. 117.)

Based on these principles, the trial court did not err here. First, defendant's proffered theory concerning her confusion regarding the status of the restraining order and her lack of intent to violate it operates only to negate the mental state element of the crime. (*People v. Lawson*, *supra*, 215 Cal.App.4th at p. 117.) Additionally, as discussed above, the jury received complete and accurate instructions as to the applicable law. (*People v. Anderson*, *supra*, 51 Cal.4th at p. 998.) Therefore, the trial court did not have a sua sponte duty to instruct on a defense that negates or rebuts the elements in section 646.9, subdivision (b). (*Ibid.*)

13

**IV. Any Instructional Error Was Harmless**

Even if the trial court erred in failing to sua sponte give the instructions—which it did not—any such error was harmless, even under the strict *Chapman* standard of beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) "[I]f the jury that rendered the verdict . . . could not rationally have found the omitted element unproven," the error can be found harmless beyond a reasonable doubt. (*People v. Sakarias* (2000) 22 Cal.4th 596, 625.)

Here, defendant argues that the omitted elements relate to her knowledge of the restraining order and her intent to violate that order. But defendant fails to acknowledge the implications of both being served with the restraining order in October 2010 and even being previously arrested for violating that same order in February 2011. No jury could rationally have found the omitted elements unproven.

### DISPOSITION

The judgment of conviction is affirmed.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Haerle, J.

14