[No. A074455. First Dist., Div. Two. Oct. 6, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID McCRAY, Defendant and Appellant.

160

**COUNSEL**

Topel & Goodman, William M. Goodman and Frank A. Cialone for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General,

Stan M. Helfman and Christopher W. Grove, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KLINE, P. J.**—David McCray appeals from felony convictions of stalking and damaging a telephone line, and misdemeanor convictions of trespass, disturbing the peace, and making annoying telephone calls. He contends the evidence was insufficient to support the stalking conviction; the trial court improperly admitted evidence of prior instances of domestic violence; and the prosecutor committed prejudicial misconduct in closing argument.

### STATEMENT OF THE CASE

Appellant was charged by information filed on August 4, 1995, with one count of aggravated trespass (Pen. Code, § 601, subd. (a)(1))[1]; four counts of making terrorist threats (§ 422); one count of stalking (§ 646.9, subd. (a)); one count of damaging a telephone line (§ 591); and two counts of making annoying telephone calls (§ 653m, subd. (a)). An amended information filed on December 5, 1995, omitted one of the counts of making a terrorist threat.

After a jury trial, appellant was convicted as charged of stalking, damaging a telephone line and one count of making annoying telephone calls. He was additionally convicted of misdemeanor trespass (§ 602.5) as a lesser related offense of aggravated trespass; and two counts of misdemeanor disturbing the peace (§ 415) as lesser related offenses of making terrorist threats. Appellant was acquitted of one count of making annoying telephone calls and the jury was unable to reach a verdict on one count of making a terrorist threat.

On May 3, 1996, appellant was sentenced to the middle term of two years for the stalking conviction, a concurrent two-year term for the damaging a telephone line conviction, and concurrent jail terms for the misdemeanor convictions.

Appellant filed a timely notice of appeal on May 24, 1996.

---

[1] All further statutory references will be to the Penal Code.

## Statement of Facts

On July 7, 1995, Michelle McCray was living with her six- and eight-year-old daughters in the Sunset District of San Francisco. Appellant, Michelle's[2] former husband, had not lived in the house with the family for three years. The couple's divorce had become final shortly before July 7. Pursuant to a court order regarding visitation, appellant was required to give Michelle 48 hours' notice before visiting the children. Michelle testified that before July 7, appellant had not been in contact with Michelle or the children for eight or nine weeks.

On July 7, Michelle arrived at home with her children about 7 p.m. As Michelle began to prepare dinner, she received a telephone call from a friend, Anthony McGinnis, whose car had broken down nearby. Michelle invited him to join her family for dinner and left with the girls to pick him up. When she returned about five minutes later, she found a message on her answering machine from appellant, saying, "Michelle, pick up the phone, I know you're there. I just drove by your house. I saw your windows and your door open and your car is in the garage, and I want to speak to my daughters." Michelle felt uncomfortable that appellant was watching her house and was in her neighborhood when he lived on the other side of town.

About 10 minutes later, appellant called again, asking, "What's up, where is my daughters. I want to speak to my daughters." Appellant said he had seen "some guy" in Michelle's car and that he did not care whom she had in the house but wanted to talk to his daughters. Michelle told him the girls had had a very long week and had been to a funeral that day, he had not spoken to them for months, and he would have to talk with her before talking with them. Appellant said he wanted to talk to the children then and she told him to call back the next day. Appellant said, "I might not be alive tomorrow." Michelle asked what was going on and if she could do anything and appellant "cussed" her and said, "there's not a goddamn thing you can do for me." Michelle hung up.

While Michelle was eating dinner, the telephone rang but she let the answering machine answer it. After dinner, she and McGinnis were talking and listening to music. About 9:15, she heard the telephone make two short "chirping" rings. The doorbell rang and Michelle looked out the open living room window to see appellant. His appearance had changed so that she did not fully recognize him: He had a full beard and an "afro," was wearing a loose pullover sweatshirt and had his hand "up in his shirt." He was pacing

---

[2]Michelle McCray will be referred to by her first name to avoid confusion, as her last name is shared by appellant and one of the witnesses at trial.

and appeared very angry. When Michelle put her head outside the window, appellant said, "Michelle, I want to talk to my daughters, and I have a gun. I'm going to start blowing holes through this house, through your body, if you don't let me see me [*sic*] daughters." Michelle asked him to calm down and leave; appellant continued pacing, his hand never left his shirt, and he threatened to kill Michelle. Michelle left the window because appellant looked like he was preparing to pull his hand out of his shirt. She tried to talk to him through the kitchen window, then returned when he said he was going to "come up there and get you." Appellant was acting "irrational, erratic, angry."

Michelle reached for her telephone to call "911" but found it dead. Appellant said, "if you check your phones, your phones don't work, do they?" McGinnis asked where the back door was and Michelle showed him, asking him to go to her neighbor's house and call "911." When Michelle returned to the living room, appellant was climbing up the iron gate to her decorative balcony, continuing to repeat that he was going to "blow holes through" Michelle and kill her and calling her a bitch. The gate led to a tunnel entrance to the house. Michelle had closed the window and appellant said, "bitch, open up the goddamn window, I want to see my daughters." Appellant, kicking the glass, kept cursing and saying he was going to start shooting and kept his hand underneath his shirt.

At some point, the children came out of their room and ran to the window, asking appellant through the window why he was on the balcony. Suddenly, appellant's mood changed as though he was happy to see the children. The girls ran downstairs and opened the garage door to see appellant. Appellant climbed down the balcony and Michelle went to the kitchen and grabbed a knife. She ran downstairs, around the opposite side of the car from where appellant was, and into the street. Appellant, told her he was going to start shooting and told her to come back and put the knife down. He was standing with his arms around the girls. Michelle told him she wanted him to leave and he said he was not going to. When he threatened to shoot Michelle, the girls started to cry and appellant spelled out, "nasty bitch." The older daughter said, "don't call my mommy a bitch," appellant denied doing so, and she said, "I know what b-i-t-c-h spells." Appellant told the children to play and they brought out a jump rope. Appellant continued to pace and cuss, and whispered to Michelle, "You fucked up my life, bitch. I hate you. I ought to kill you right now. I hate you."

Michelle saw a police car on her street and walked to meet it; appellant told her "don't do that." Appellant was taken aside for questioning and Michelle and the girls went into the house with an officer. Michelle played

the message that had been left on the answering machine during dinner, about 9:50. The message was from appellant, saying, "I don't care about your company in there, if you don't pick up this phone I'm going to walk across the street and blow the doors off the son of a bitch." The police checked Michelle's telephones, looked outside at the phone line and discovered that it had been cut in half. Appellant was arrested and searched and did not have a gun.

Michelle never saw a gun during the July 7 incident but testified that she believed he was capable of shooting her because in 1990 he had put a shotgun to her head. She would have feared physical violence even if appellant had not had a gun, as appellant had been physically violent to her in the past. She did not believe appellant had come to the house at 10:00 at night to see the children but rather to hurt her, as he said he had been in the neighborhood for two hours and she believed he had been stalking her.

With respect to the incident in 1990, Michelle testified that on January 11, 1990, she and appellant had an argument in which appellant pushed her, she pushed him back, he pushed her down on the bed and put a pillow over her face, she fought to get him off and he eventually took the pillow off her face, grabbed her and threw her into a wall mirror, which broke when her head hit it. She heard her daughter screaming and said she needed to check on the children but he grabbed her, threw her back on the ground and dragged her through the hallway. She finally kicked loose and went to her daughters' room, where she grabbed the newborn from her crib and went to the two-year-old's bed, trying to console the crying children. As she sat with them, she felt something at her head, looked and saw that appellant was holding a shotgun to her head. Appellant said, "I ought to blow your ass away." She asked him not to hurt her in front of the children. He stood and looked at her, then left and went to the living room. She did not call the police because she did not want to lose her family and did not want to send her husband to jail. As a result of this incident, Michelle had bruises around her neck and on her arms, legs and the side of her ribs. She did not seek medical treatment.

Michelle further testified that on October 3, 1992, when she and appellant were about to separate, appellant came home in the early morning hours, found the chain on the door and rang the door bell repeatedly. He was angry and she said she would open the door but told him to calm down. When she opened the door he pushed her and she fell onto the stairs. The children, who had been awakened, came to the top of the stairs. At the top of the stairs, in front of the children, appellant grabbed Michelle's T-shirt and ripped it down toward her waist, cursing at her. Michelle called 911 and appellant left when the police arrived.

Michelle testified that in 1984, when she and appellant had been married a few months and were living in Louisiana to care for appellant's mother, who had had a stroke, they had an argument about appellant's mother. Appellant put a pillow over her face, dragged her down the hallway, through the living room to the kitchen, and slammed her against the refrigerator, cutting her lip. Appellant's mother, who was present during the incident, distracted appellant and Michelle was able to get away. She ran outside and hid behind a church, then later returned. She did not call the police because she was 19 years old, did not know anyone, and had just been married.

Police Officer Mary Rodriguez and her partner reported to Michelle's house a couple of hours after going on duty at 8:30 p.m. on July 7. Other officers were already there talking to appellant. Rodriguez testified that Michelle was upset but not crying. Michelle told Rodriguez appellant had threatened her with a gun. Neither Rodriguez's report nor Michelle's statement written the night of the incident referred to a gun and Michelle did not tell Rodriguez she went outside with a knife. After being given his *Miranda* warnings, appellant said he had cut the telephone line and it was a stupid thing to have done.

Anthony McGinnis confirmed Michelle's account of the portion of the evening with which he was involved. He testified that Michelle was "very emotional, scared" when she asked him to call 911 as he left her house and that he was "kind of scared" because she had said her ex-husband had a gun.

Appellant testified that in the nine weeks preceding July 7, 1996, he had seen his daughters at school and at their babysitter's; he had visited with them three and a half weeks before the 7th. On the evening of July 7, he was taking a bus that passed directly in front of Michelle's house and noticed that the doors and windows were open and the blinds were back, indicating someone was at home. When he got off the bus, appellant called and got a busy signal, then called again and left a message on the machine. He decided to wait to try to visit his daughters and take them for a walk. When he called again and reached Michelle, she would not allow him to talk to the girls. She told him to call back after dinner and he agreed. Appellant denied telling Michelle he did not know whether he would be alive the next day.

About 35 or 40 minutes later, appellant called again and left the telephone message in which he threatened to "blow the gate off." He testified he did not really intend to do this but it was "something silly to say" to prompt Michelle to answer the phone. Appellant called back a little later and got no answer, then tried to page Michelle but she did not return the call. He decided to walk to the house, and found the windows and doors open, music playing, and his daughters playing.

Appellant rang the doorbell and Michelle asked who it was from the living room window. Appellant asked where the girls were and Michelle started yelling, slammed the window, then opened it and asked what he was doing in front of the house. Appellant asked her to calm down, come downstairs and talk to him. She told him to leave, he said he wanted to talk to his daughters and she slammed the window again. Michelle appeared in the kitchen window and said she was going to call the police. She refused to talk to appellant and he laughed, saying he was trying to abide by what she said but she was not keeping her word by not allowing him to talk to the girls. Appellant removed tape that he had placed on the telephone line in the past to repair it when it was accidentally severed and pulled the wires apart. He did this because he did not want to "go through a whole bunch of unnecessary problems later on." Michelle asked what he had done to the telephone and he said he had disconnected it and would reconnect it after they talked. She slammed the window and appellant saw her leading a person to the back door. When she returned to the living room window, he asked her again to talk; she said she wanted him to leave and he asked to talk to the girls. She said she would let them come to the window and he would have to come up if he wanted to see them. He asked if she was serious, then climbed up to the balcony. She started to yell, "why are you doing this," and he told her he was doing what she said he had to do to see his children. At this point, the girls came out of their bedroom, saw him on the balcony and ran to open the garage door. Appellant testified he did not kick the window, threaten to "blow [Michelle's] ass away," or make any other threats to her.

As appellant was standing in the driveway hugging and talking to the girls, Michelle ran by with a knife in her hand. The girls asked what was wrong with their mother and he told them to wait, went to the end of the driveway and yelled to Michelle that she looked like a fool and was worrying her daughters. Michelle looked at her bare feet, her hand, and appellant, then turned and walked back. Appellant did not threaten Michelle. When the police arrived, appellant cooperated with them. He denied telling the police he had cut the telephone line, as opposed to disconnecting it by untaping it. He claimed he was unaware of any divorce proceedings when he went to the house on July 7.

Appellant testified that the 1984 incident Michelle described in fact occurred before the couple was married. Appellant denied, however, the events Michelle related, testifying Michelle slapped him and then fell when she tried to strike him and he moved out of the way. He further denied owning a shotgun on January 11, 1990. He testified that on that date, Michelle was "tipsy" and hit him in the back of the head with a large ring of keys. She also slapped him, spit in his face, clawed his back as he tried to

hold her, and kicked him in the groin. The next day, Michelle apologized. Appellant testified that they never had a mirrored wall in the house and he never threw Michelle against one. Appellant testified that on October 23, 1992, he came home from work about 1 a.m., found the door chained from the inside and had to ring the bell. After letting him inside, Michelle showed appellant some dress shirts of his that she had ripped or "shredded." He told her he was going to show her how it felt to have your "stuff cut up," followed her up the stairs and ripped her T-shirt across the shoulder. She called 911; he waited for the police to arrive and when they told him he should leave the house he went to sleep in his car. Appellant testified he showed the police the shirts Michelle had cut up.

On rebuttal, Police Officer Seth Riskin testified that he responded to the McCray residence about 2:30 a.m. on October 3, 1992. Michelle was distraught and wearing a T-shirt that was "torn and kind of hanging on her body." Appellant did not show Riskin any torn shirts or tell him Michelle had torn his shirts. .

Tracy McCray, appellant's sister, testified that she had a conversation with appellant on July 3, 1995, about his divorce being final. She testified that she babysat for appellant and Michelle on or about January 11, 1990, and did not recall either of them being intoxicated when they came home or Michelle acting violently that night. McCray believed her brother and Michelle had had a wall mirror in their bedroom that got broken during an altercation between the two. After January 11, McCray saw bruises on Michelle's neck and Michelle told her appellant had choked her the night before. Michelle did not tell her anything about appellant holding a shotgun to her head.

DISCUSSION

I.

Appellant contends his stalking conviction cannot stand because a conviction under section 646.9, subdivision (a), may not be based on a single instance of harassment and the evidence was insufficient to show repeated harassment, as all the actions relied upon to prove the stalking charge occurred within the space of a few hours on a single evening.

Section 646.9, subdivision (a), provides: "Any person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family, is guilty of

the crime of stalking, punishable by imprisonment in a county jail for not more than one year or by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment, or by imprisonment in the state prison."

Subdivision (e) of section 646.9 provides: "For the purposes of this section, 'harasses' means a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose. This course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person."

Subdivision (f) of section 646.9 provides: "For purposes of this section, 'course of conduct' means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of 'course of conduct.' "

Appellant urges, that by the plain language of subdivision (a) of section 646.9, a conviction for stalking requires proof that the defendant "willfully, maliciously, and repeatedly follow[ed]" or "willfully, maliciously, and repeatedly . . . harass[ed]" another person; in other words, that the term "repeatedly" in this statute modifies "harasses" as well as "follows." A different conclusion was reached by the court in *People* v. *Heilman* (1994) 25 Cal.App.4th 391 [30 Cal.Rptr.2d 422], based upon its reading of subdivision (a) in conjunction with the other subdivisions of the statute quoted above.

*Heilman* explained: "A fair reading of section 646.9, leads us to conclude that the stalking statute addresses two distinct behaviors, only one of which depends upon our interpretation of the term 'repeatedly.' Under the statute, one can be penalized either for willful, malicious, *repeated following* or willful, malicious harassment. Subdivision [e] specifically defines the phrase harassment to mean a 'course of conduct' which in turn is defined as 'a series of acts over a period of time, however short, evidencing a continuity of purpose' in order to delineate the number of instances and time frame of contacts required to constitute harassment. Necessarily then, harassment includes multiple acts. Thus, reading the statute so that 'repeatedly' modifies 'harasses' as well as 'following' would require perpetrators to engage in a repeated series of acts over a period of time evidencing a continuity of purpose before being guilty of a stalking misdemeanor. Such a reading is inconsistent with the intent of the statute to penalize a single course of

conduct of harassment. We conclude, therefore, 'repeatedly' modifies 'following' and not 'harassment.' " (25 Cal.App.4th at p. 399, fn. omitted, italics in original.)

Courts in other jurisdictions with similar stalking statutes have reached the same conclusion as *Heilman*. (*State* v. *Fonesca* (R.I. 1996) 670 A.2d 1237, 1239; *Snowden* v. *State* (Del. 1996) 677 A.2d 33, 37 [29 A.L.R.5th 784]; *Commonwealth* v. *Kwiatkowski* (1994) 418 Mass. 543 [637 N.E.2d 854, 857-858]; but see *U.S.* v. *Smith* (D.C. 1996) 685 A.2d 380, 385 [finding "repeatedly" modifies "harasses" as well as "follows"].) We agree that it would be "illogical to read the statute to require repeated harassing when harassing itself is defined as consisting of repetitive acts." (*Snowden* v. *State*, *supra*, 677 A.2d at p. 37.)

We do, however disagree with *Heilman* in one respect. The critical phrase in subdivision (a) of section 646.9 is "willfully, maliciously, and repeatedly follows or harasses . . . ." *Heilman* concluded the terms "willfully," "maliciously" and "repeatedly" all modified "follows," but only "willfully" and "maliciously" modified "harasses." The structure of the sentence does not support this construction: As the three modifiers precede both "follows" and "harasses," either all three apply to both types of acts, or the modifiers do not apply to "harasses" at all. As indicated, we reject the former interpretation as illogical and contrary to the presumed legislative intent to penalize a single course of harassing conduct. "Harasses," however, is defined as "a knowing and willful course of conduct . . . ." The statutory definition of "harasses" thus includes specification of the required mental state. To read section 646.9 as requiring proof the defendant "willfully" engaged in a "knowing and willful course of conduct" would be redundant and would make no more sense than to read it as requiring proof that a series of acts occur more than once. We conclude the two types of conduct upon which a stalking conviction may be based are willful, malicious and repeated following, on the one hand, and harassment (according to the statutory definition), on the other.

Appellant urges *Heilman* was wrongly decided in contravention of principles of statutory interpretation requiring courts to give effect to the plain meaning of a statute and to construe ambiguous provisions in favor of a defendant. (*People* v. *Squier* (1993) 15 Cal.App.4th 235, 241 [18 Cal.Rptr.2d 536].) We disagree. The plain meaning of section 646.9, subdivision (a), must necessarily be determined with reference to subdivisions (e) and (f) of the statute, which specifically define the term "harasses" used in subdivision (a). The only logical meaning that emerges from consideration of the statute as a whole is the one we have just described.

■ "A fundamental rule of statutory construction is to interpret the statute consistent with the intent of the Legislature. [Citation.] [¶] Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter should, if possible, be read to conform to the spirit of the law. [Citation.]" (*People* v. *Crowles* (1993) 20 Cal.App.4th 114, 118 [24 Cal.Rptr.2d 377].) ■ As *Heilman* concluded, the Legislature plainly intended to penalize a single series of separate acts constituting harassment. In any event, as explained above, our interpretation of section 646.9, subdivision (a), as requiring *either* willful, malicious and repeated following *or* harassment, as defined in subsequent subdivisions of the statute, is just as "literal" as the interpretation appellant urges.[3]

Appellant makes no suggestion the evidence does not support a conviction for stalking under an interpretation of the statute that does not require the harassment to be "repeated." Plainly, the evidence supported the jury's determination that appellant engaged in harassment within the meaning of section 646.9 and made a credible threat with the intent to place Michelle in reasonable fear for her safety. (§ 646.9, subd. (a).)

II.

■ Appellant next urges the trial court erred in admitting evidence of appellant's past violence against Michelle. The trial court found this evidence relevant to the issues of intent and motive and its probative value outweighed its prejudicial impact. Appellant urges the evidence was only minimally probative and highly prejudicial.

Under Evidence Code section 1101, subdivision (b), evidence that the defendant committed a crime, civil wrong, or other act is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

---

[3]Appellant urges that "literal construction" of the statute (by which he means construction of repeatedly as modifying "harasses" as well as "follows") is consistent with reported cases in which stalking convictions were based on conduct spanning days, weeks, or months rather than hours in a single day. (E.g., *People* v. *Sotomayor* (1996) 47 Cal.App.4th 382 [54 Cal.Rptr.2d 871]; *People* v. *Tran* (1996) 47 Cal.App.4th 253 [54 Cal.Rptr.2d 650]; *People* v. *McClelland* (1996) 42 Cal.App.4th 144 [49 Cal.Rptr.2d 587]; *People* v. *Carron* (1995) 37 Cal.App.4th 1230 [44 Cal.Rptr.2d 328].) That reported cases thus far have involved such fact patterns, however, does not indicate they are the only fact patterns within the purview of the statute.

The crimes with which appellant was charged required proof of his intent to place Michelle in fear for her safety or that of her family and, in the case of the aggravated trespass charge, to carry out a threat to inflict serious bodily injury. (§§ 646.9, subd. (a), 422; 601, subd. (a)(1).) The evidence of past violence perpetrated by appellant against Michelle was clearly relevant on these issues. In the context of a defendant convicted of murdering his wife, the court in *People* v. *Linkenauger* (1995) 32 Cal.App.4th 1603, 1610 [38 Cal.Rptr.2d 868], explained: " 'Evidence tending to establish prior quarrels between a defendant and decedent and the making of threats by the former is properly admitted . . . to show the motive and state of mind of the defendant. . . .' " (*Id.*, at p. 1612, quoting *People* v. *Cartier* (1960) 54 Cal.2d 300, 311 [5 Cal.Rptr. 573, 353 P.2d 53].) ■ " 'Where a defendant is charged with a violent crime and has or had a previous relationship with a victim, prior assaults upon the same victim, when offered on disputed issues, e.g., identity, intent, motive, etcetera, are admissible based solely upon the consideration of identical perpetrator and victim without resort to a "distinctive modus operandi" analysis of other factors.' " (32 Cal.App.4th at p. 1612, quoting *People* v. *Zack* (1986) 184 Cal.App.3d 409, 415 [229 Cal.Rptr. 317].)

"The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.]" (*People* v. *Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757].) ■ In the present case, while the past incidents involved actual violence while the present offenses involved at most threats of violence, the evidence that appellant had been violent toward Michelle in the past was plainly relevant to the jury's determination whether appellant intended to cause Michelle fear on July 7, as it tended to demonstrate both that appellant was capable of inflicting physical harm upon Michelle and that Michelle would have reason to fear his threats might be carried out. (See *People* v. *Kelley* (1997) 52 Cal.App.4th 568, 579 [60 Cal.Rptr.2d 653] [evidence of prior molestation conviction admissible in prosecution for stalking same victim].)

The offenses with which appellant was charged also required the prosecution to prove that Michelle was reasonably caused to be in fear for her safety by appellant's threats (§ 422) or that the threats would cause a reasonable person to suffer substantial emotional distress (§ 646.9, subd. (a)). The evidence of past domestic abuse was highly relevant and probative on these issues; indeed, it is difficult to imagine how the jury could have properly assessed Michelle's response to appellant's conduct without knowledge of these past incidents. "Appellant was *not entitled to have the jury* determine his guilt or innocence on a false presentation that his and the victim's relationship . . . [was] peaceful and friendly." (*People* v. *Zack*, *supra*, 184 Cal.App.3d at p. 415.)

Given the relevance and probative value of the evidence of past domestic violence, it is clear the court did not abuse its discretion in finding the probative value was not "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice." (Evid. Code, § 352.) Especially considering the length of the McCrays' relationship, the past incidents were not so remote as to be inadmissible. (See *People v. Ewoldt, supra,* 7 Cal.4th at p. 405.) Although the most recent past incident occurred almost three years before the present offenses, the couple had been separated for three years and their divorce had just become final at the time of the offenses on July 7, 1995.

### III.

Finally, appellant contends the prosecutor engaged in prejudicial misconduct by arguing that the evidence of prior violence by appellant against Michelle demonstrated Michelle's state of mind at the time of the present offenses, as the trial court admitted the evidence only on the issue of appellant's motive, intent and means or ability to commit the charged offenses. The prosecutor relied heavily on the domestic violence evidence in closing argument, urging for example that the jury knew about Michelle's "absolute terror" because it knew appellant had beaten her, choked her, dragged her, put a gun to her head and tried to rip off her shirt in the past, and responding to the suggestion of defense counsel that the case was "overblown" by reiterating details of the past incidents.

In the first place, appellant's claim of prosecutorial misconduct may not be raised on appeal. ■ "To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct." (*People v. Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People v. Mayfield* (1997) 14 Cal.4th 668, 801 [60 Cal.Rptr.2d 1, 928 P.2d 485].) In any event, we find no misconduct in the present case, certainly none an admonition could not have cured.

■ " '[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper. Opposing counsel may not complain on appeal if the reasoning is faulty or the conclusions are illogical because these are matters for the jury to determine.' " (*People v. Thomas* (1992) 2 Cal.4th 489, 526 [7 Cal.Rptr.2d 199, 828 P.2d 101], quoting *People v. Lewis* (1990) 50 Cal.3d 262, 283 [266 Cal.Rptr. 834, 786 P.2d 892]; *People v. Beivelman* (1968) 70 Cal.2d 60,

76-77 [73 Cal.Rptr. 521, 447 P.2d 913], overruled on other grounds in *People* v. *Green* (1980) 27 Cal.3d 1, 33-34 [164 Cal.Rptr. 1, 609 P.2d 468].) As explained in the preceding section of this opinion, the evidence of past domestic violence was highly relevant and probative both on the issue of appellant's intent and on the issue of Michelle's state of mind, also an element of some of the offenses with which appellant was charged. The prosecutor's comments addressed this issue. This was not a situation such as occurred in *People* v. *Craig* (1957) 49 Cal.2d 313, 320 [316 P.2d 947], upon which appellant relies, where the prosecutor commented on evidence admitted for a limited purpose in a manner not justified by any legitimate purpose. "In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury." (*People* v. *Price, supra,* 1 Cal.4th at p. 447.) This did not occur here.

The judgment is affirmed.

Haerle, J., and Ruvolo, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 14, 1998.