Filed 10/27/14  P. v. Lesdesma CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B251607 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA128016) |
| v. | |
| SERGIO LEDESMA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Tammy Chung Ryu, Judge.  Reversed.

Jasmine C. Patel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Yun K. Lee and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Sergio Ledesma appeals from a judgment entered following a jury trial in which he was convicted of making a criminal threat. Defendant contends the trial court erred by admitting evidence unknown persons had fired shots at the victim's restaurant.

We agree. The prosecutor conceded no evidence implicated defendant in the shooting, which was therefore irrelevant to the charges against defendant, as well as highly inflammatory. We conclude the error was prejudicial and reverse defendant's conviction.

## BACKGROUND

### 1. Prior incidents

Andres Solorzano operated a restaurant called El Infierno on Santa Fe Avenue in Compton. For about six months, a group, including defendant and five to seven other men, congregated on the grounds of an apartment building across the street from El Infierno. Members of the group drank liquor and yelled at Solorzano from across the street, saying they did not want Solorzano there. Defendant participated in this conduct and yelled that he wanted Solorzano to leave. Sometimes members of the group crossed the street to purchase liquor at a store in the same strip mall as El Infierno. This annoyed Solorzano and he tried to keep them from doing so. Solorzano had previously called the police about the group, and one time an officer came out, but Solorzano thought the officer "did not listen to" him.

On April 19, 2013,[1] Jose Garcia encountered Solorzano inside the liquor store near El Infierno and threatened to kill him. Solorzano had seen defendant and Garcia together "every day" in the group across the street, but defendant was not present when Garcia threatened Solorzano. Garcia's "exact words" were, "'We are already in agreement. We're going to kill you. We don't want you here.'" A Los Angeles sheriff's deputy arrested Garcia. The deputy identified defendant as someone he saw across the street, drinking alcohol.

---

[1] Date references pertain to 2013.

2

About 10:30 p.m. on April 19, while El Infierno was closed for the night, it "was shot up," causing serious damage. Solorzano testified that the restaurant's surveillance camera "taped two people shooting at the business."[2]

A deputy who responded to El Infierno after the shooting also testified about the damage he observed, Solorzano's fear, the number of shots fired, the location of bullet holes, and that a large-caliber "auto weapon," perhaps an AK47, M16, or AR15, was used. The deputy testified he reviewed a surveillance video, but "it was just too dark and . . . you just couldn't see anything." Solorzano told the deputy he often engaged in "verbal confrontations" with people who congregated at an apartment complex across the street.

## 2. The charged offense

On April 28, about 20 people were drinking across from El Infierno and the group "started bothering" Solorzano, so he went outside. Solorzano testified defendant "went on to the middle of the street and he told me from there that he was going to kill me." Solorzano further testified defendant "told me he was going to finish what the other person hadn't." "Because of the shooting at" El Infierno, Solorzano believed defendant was going to kill him. Defendant stood in the middle of the street for about half an hour, yelling at Solorzano. Defendant did not appear to have a weapon, and Solorzano had never seen him with a weapon. Some of the other men began throwing peaches at the restaurant, and Solorzano told his employee, Maria Pelayo, to call law enforcement. Solorzano thought defendant was capable of carrying out his threat "[b]ecause of the shooting to [his] business."

Deputy Daniel Hoyos responded to El Infierno on April 28. He testified defendant was across the street from El Infierno, with other people, and Solorzano was "in the street, pointing at the suspect." Solorzano told Hoyos "he was fighting with the guys

---

[2] Outside the presence of the jury, the prosecutor told the court he had no surveillance footage from El Infierno regarding any of the incidents.

3

across the street. It is a continuous issue of them fighting back and forth." Solorzano told Hoyos defendant said, "'I'm going to kill you because the other guy didn't.'" Hoyos asked if there had been other crimes at the restaurant, and Solorzano told him "the night prior his shop was shot at," and "earlier someone else threatened him."

Hoyos attempted to talk to defendant to hear his side of the story, but defendant was under the influence of alcohol and uncooperative. Hoyos arrested him.

On May 7, El Infierno burned down. The jury was not informed defendant was in custody at the time, and the court gave no limiting instruction regarding the fire.

**3.      Defense case**

Defendant testified he had previously been a customer at another restaurant Solorzano had owned and liked Solorzano's food. He denied being disrespectful to or provoking Solorzano. Solorzano, however, had called defendant names, such as "'drunk,'" "'low life,'" and "'wet back,'" and they had argued. Three years earlier, Solorzano had called the police about defendant, and the police had arrested defendant after he jokingly told them he wanted to hurt Solorzano.

Defendant liked to hang out across the street from El Infierno with his friends to talk and drink beer. He went there two or three days a week and had done so for about three years. Solorzano had called the police about the group several times. Defendant had seen Solorzano arguing with many people who went to the other businesses in the shopping center, but defendant had not argued with Solorzano since the incident three years earlier. Defendant thought Solorzano was "kind of confused as to who may" have been "hurting him" because he had fought with so many people. Defendant denied he was involved in a plan to kill Solorzano, but he had heard a rumor or joke that he and someone else "wanted to burn the place down." He further denied being present when Garcia was arrested and did not even know what had happened.

On April 28, defendant was walking from the liquor store in the same shopping center as El Infierno to his customary hang-out across the street when he saw Solorzano looking at him hatefully. Solorzano said defendant would be the next person to be

4

arrested. From across the street, defendant said that if Solorzano was a man, he would face his problems by himself, without "calling the police for nothing." Defendant denied making the threat Solorzano reported. Defendant was intoxicated and did not remember exactly what he said to Solorzano, just that he was cursing and insulting Solorzano, just as Solorzano was insulting him. During their argument, defendant never left his spot across the street from El Infierno.

A recording of a call to the sheriff's station by Maria Pelayo was played at trial. The recording began with a statement by someone who interpreted Pelayo's statements for the sheriff's employee, stating Pelayo had "said the owner asked her to call you because the people that, th', that shot the business last week, they're throwing rocks at the business right now, at the restaurant."

**4.     Prosecution's rebuttal case**

Pelayo testified the people across the street were throwing rocks at the front of El Infierno on April 28. Solorzano was outside arguing with defendant, who was standing in the middle of the street. Solorzano asked Pelayo to call the police. While she was on the phone with the police, she continued to watch the people throwing rocks outside on the monitor connected to the restaurant's cameras.

**5.     Verdict and sentencing**

The jury convicted defendant of making a criminal threat in violation of Penal Code section 422.[3] The court sentenced defendant to two years in prison.

DISCUSSION

Defendant contends the trial court erred by admitting evidence of the restaurant shooting with respect to the element of Solorzano's fear because there was no evidence defendant had anything to do with the shooting. He argues the error violated defendant's rights to due process and free speech. He does not challenge admission of evidence of Garcia's threat against Solorzano.

---

[3] Undesignated statutory references are to the Penal Code.

5

**1. Proceedings in the trial court**

    **a. Request to admit evidence of shooting**

Before trial began, the court granted, over defendant's objection, the prosecutor's request to admit evidence of Garcia's prior threat against Solorzano to show its effect on Solorzano because "apparently that reference to the other guy" in defendant's threat "may be to Jose Garcia and what Mr. Garcia may have said" to Solorzano.

The prosecutor later asked the court to admit evidence regarding the shots fired at Solorzano's restaurant. The prosecutor conceded there was no evidence implicating either defendant or Garcia in the shooting, and represented he "obviously" would not argue defendant "was somehow connected to the shooting" or proffer any evidence on that point. He argued, however, the evidence was admissible to show Solorzano's "sustained fear of [defendant's] threat," explaining Solorzano had told him the sequence and timing of events, including Garcia's threat, the shooting, and defendant's threat, caused him to take defendant's threat seriously. The court expressed concern that, absent evidence linking defendant to the shooting, the shooting "may be more prejudicial than probative" and not "really helpful to the jury at all. I mean, it just prejudices them." The prosecutor argued the absence of any evidence linking defendant to the shooting actually "mitigates the potential prejudice because through cross-examination and argument, [defense counsel] can basically say [defendant] was not" involved.

Over defendant's objection, the court allowed the prosecutor to introduce evidence of the shooting, saying, "No one was arrested or charged with that crime, so it will go, obviously, towards reasonableness of the fear of the victim, Mr. Solorzano, in light of what he knew of the circumstances as he believed existed at the time. [¶] So it goes to the reasonableness of the fear, the disputed fact that it does look like it is relevant. I did consider it may be more prejudicial than probative. However, it appears that it is more probative than prejudicial, at this time, and also that it's not going to take long. It's already been discussed at prelim."

### b.  References to, and evidence of, the shooting

Thereafter, the jury heard numerous references to the shooting.  In his opening statement, the prosecutor told the jury that the day after Garcia was arrested for his threat, the "restaurant was shot up.  Multiple gunshots were hurled at his restaurant.  I will show you some pictures of that."  After describing defendant's alleged threat, the prosecutor said, "Those words, compounded by the fact that his business had been shot up by his [*sic*] companion,[4] at least the person he hangs out with, threatened his life, made Mr. Solorzano in great fear for his life.  [¶]  It was reasonable, based upon the incident that happened, the contact, and that he was in sustained fear, which is one of the elements of the crime because he believed that [defendant] was, in fact, serious[,] that he was capable of carrying out this threat, and that based upon the prior contacts, he thought it was going to happen."

Solorzano thereafter testified El Infierno "was shot up" on April 20.[5]  Asked by the prosecutor what he meant by "'shot up,'" Solorzano replied, "They finished it with the shooting."  The prosecutor introduced three photographs of the damage to El Infierno, which were later admitted in evidence, and both Solorzano and a responding deputy described the damage.  The deputy volunteered his thoughts on the type of assault rifle used.  Solorzano nonresponsively testified on cross-examination that the restaurant's video cameras "taped two people shooting at the business."

Thereafter, Solorzano testified to defendant's April 28 statements and said he interpreted the reference to finishing "what the other person hadn't" as meaning defendant was going to kill him.  The prosecutor asked Solorzano if his belief was based solely on what defendant had said or "everything that happened."  Solorzano replied, "Because of the shooting at my business."  The prosecutor asked Solorzano why he

---

[4]  Nothing in the record indicates any of defendant's companions were involved in the shooting.

[5]  Although a deputy testified the shooting was reported on the night of April 19, the court, counsel, and Solorzano referred to the shooting as having occurred on April 20.

thought defendant was capable of carrying out his threat. Solorzano again replied, "Because of the shooting to my business."

During the defense case, the jury heard the recording of Pelayo's call to the sheriff's department on April 28, which included the interpreter's statement that "the people that . . . shot the business last week, they're throwing rocks at the business right now, at the restaurant."

The prosecutor referred to the shooting numerous times during his arguments. After addressing the threat by Garcia and saying Solorzano took Garcia's threat seriously, the prosecutor stated, "Four days later, his business is shot up. You saw the pictures. Bullet holes. What did the officer—the deputy testify? It seemed like a large caliber weapon riddled the place, broke glass, broke TV's, basically rendered his business just a pile. [¶] So what happens? The next day, like clock work, [defendant] and his friends are back out there and he says to him, 'I'm going to finish what the other one didn't do.'"[6] Addressing whether the threat caused Solorzano to be in sustained fear for his safety, the prosecutor argued, "All of the things that I just talked about are the circumstances of the threat, the business being shot up." A little later the prosecutor argued, "Mr. Solorzano made it very clear from the witness stand that he did take it seriously and he thought that it was going to be carried out because of what had happened just in the last week."

In his rebuttal argument, the prosecutor addressed an argument by defense counsel regarding the absence of video evidence. After referring to Garcia's threat, the prosecutor argued, "Second incident. Shot up the place. Grab the video equipment. Couldn't get anything up on it. Got it fixed. Came back when this situation; right? What happened? Couldn't bring it up. [Pelayo] was looking at it through the camera. That's how—we know that. At least the cameras were working. But what do we know? The police never

---

[6] The prosecutor misstated the timing of both the shooting and the threat by defendant.

got it. Three weeks later the place burned down." Moments later, the prosecutor argued, "What's important, though, is that you focus on the context, again, of this crime. It was about an earlier incident. It was about a pattern of activity that made Mr. Solorzano afraid."

### c. Court's limiting instruction

The trial court instructed the jury as follows regarding the evidence of Garcia's threat and the shooting: "During the trial, certain evidence was admitted for a limited purpose. That evidence pertains to the April 19, 2013 incident involving Jose Garcia also known as Jose Lopez and to the April 20, 2013 incident in which the victim's business was shot at. Th[is] evidence may be considered for the purpose of determining the reasonableness of [the] victim's fear and his sustained fear. You may consider th[is] evidence only for those purposes and for no other."

## 2. Pertinent principles of law

### a. Admission and exclusion of evidence

We review any ruling on the admissibility of evidence for abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 577.)

Only relevant evidence is admissible. (Evid. Code, § 350.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Evidence Code section 352 provides that the court may, in its discretion, exclude relevant evidence if its probative value is substantially outweighed by the probability that its admission will either be unduly time consuming or create a substantial danger of undue prejudice, confusion of the issues, or misleading the jury.

"Evidence of other similar crimes linked to no one at all is clearly inadmissible to prove any element of the crime charged against a defendant, even though the crime occurred within reasonable proximity of time and place." (*People v. Jackson* (1967) 254 Cal.App.2d 655, 658 (*Jackson*).) The admission of such evidence places an impossible

9

burden upon the defendant to prove the innocence of a third person, and thus violates due process. (*Id.* at p. 660.) "The 'extreme caution' enjoined upon the courts in admitting [evidence of uncharged misconduct] is magnified when the prosecution attempts to prove the commission of a crime by a person other than the defendant on trial." (*People v. Long* (1970) 7 Cal.App.3d 586, 590–591.)

The admission of evidence may violate due process if there is no permissible inference a jury may draw from the evidence. (*People v. Steele* (2002) 27 Cal.4th 1230, 1246; *People v. Albarran* (2007) 149 Cal.App.4th 214, 229.) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

### b. Criminal threats

A criminal threat in violation of section 422 is a willful threat to commit a crime that will result in death or great bodily injury to another person. On its face and under the circumstances in which it is made, the threat must be so unequivocal, unconditional, immediate, and specific as to convey to its subject a gravity of purpose and an immediate prospect of execution. The threat must reasonably cause its subject sustained fear for his or her safety or that of his or her immediate family, and must have been made with the specific intent that it be taken as a threat. No intent to actually carry out the threat is required. (§ 422; *People v. Toledo* (2001) 26 Cal.4th 221, 227–228.)

"[A]ll of the surrounding circumstances should be taken into account to determine if a threat falls within the proscription of section 422. This includes the defendant's mannerisms, affect, and actions involved in making the threat as well as subsequent actions taken by the defendant." (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013 (*Solis*).) "[A] jury can properly consider a later action taken by a defendant in evaluating whether the crime of making a terrorist threat has been committed. . . . [A]ll of the circumstances can and should be considered in determining whether a terrorist threat has been made." (*Id.* at p. 1014.)

Section 422 does not apply to every threatening statement. It instead applies only

10

to "a specific and narrow class of communication," that is, "the expression of an intent to inflict serious evil upon another person." (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 863.) The standard set forth in section 422 is also "the constitutional standard for distinguishing between punishable threats and protected speech. Accordingly, in applying section 422, courts must be cautious to ensure that the statutory standard is not expanded beyond that which is constitutionally permissible." (*In re Ryan D.*, at pp. 861–862.)

**3.     The trial court erred by admitting third party other crimes evidence**

Appellate courts have held surrounding circumstances such as "the defendant's mannerisms, affect, and actions involved in making the threat" (*Solis*, *supra*, 90 Cal.App.4th at p. 1013), the victim's knowledge of defendant's history of violence (*People v. Garrett* (1994) 30 Cal.App.4th 962, 965, 967; *People v. McCray* (1997) 58 Cal.App.4th 159, 172), and subsequent actions taken by the defendant (*People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1163; *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1341 (*Mendoza*); *People v. Martinez* (1997) 53 Cal.App.4th 1212, 1221) to be relevant and admissible in criminal threat cases.

Here, however, the purported circumstance—the restaurant shooting—was conduct neither committed by defendant nor in any way attributable to defendant, e.g., defendant did not aid and abet the shooting or incite its commission. Although the restaurant shooting understandably increased Solorzano's overall level of fear, the shooting was not relevant to the criminal threats charge or to any witness's credibility. Defendant's threat and any surrounding circumstances attributable to defendant—not unrelated conduct by third persons for which defendant was in no way responsible—had to cause Solorzano's sustained, reasonable fear. Defendant's own prior interactions with Solorzano and his demeanor, gestures, and actions before, during, and after the threat were relevant, admissible circumstances, but criminal conduct by unidentified, uncharged persons having no connection to defendant was not. Permitting the jury to consider fear caused by unrelated conduct for which defendant was in no way responsible not only ignores the elements of the statute, it creates a substantial due process issue by reducing

11

the prosecution's burden of proof as to defendant and potentially violates the First Amendment by criminalizing speech that does not constitute an actionable threat. In addition, any minimal probative value of the restaurant shooting was substantially outweighed by an extreme risk of undue prejudice, as the trial court initially seemed to recognize. Accordingly, the trial court abused its discretion by admitting evidence of the restaurant shooting.

The Attorney General argues *Mendoza*, *supra*, 59 Cal.App.4th 1333, supports admission of evidence of the conduct of third persons to support a section 422 charge. In *Mendoza*, everyone involved was a member or associate of the same street gang. After the victim testified against the defendant's brother, the defendant visited her and said she had "'fucked up his brother's testimony'" and the defendant was "'going to talk to some guys from'" the gang. (*Mendoza*, at p. 1337.) The victim did not initially consider this as a threat, but did so about 20 minutes later after she saw two members of the gang sitting in a car outside her house looking at her and honking the car's horn, then heard from her sister that one of the two people in the car outside was looking for her. (*Id.* at p. 1338.) The issue considered on appeal was the sufficiency of evidence to support the defendant's conviction under section 422, not the admissibility of the conduct of the other gang members with respect to defendant's guilt. Moreover, it was reasonable to infer defendant had carried out his stated intent of talking to members of the gang, and had thereby caused the other gang members to sit outside the victim's house to intimidate her. (*Mendoza*, at p. 1341.) Here, nothing indicated defendant was in any way connected to or responsible for the shooting.

The Attorney General attempts to distinguish *Jackson*, *supra*, 254 Cal.App.2d 655, as limited to an intent element. It is not, and no rationale supports such a limitation.

The Attorney General further argues defendant incorporated the restaurant shooting, as well as Garcia's threat, into his own threat because the shooting occurred shortly after Garcia made his threat and the shooting could have resulted in injury or death. This theory directly contradicts the stance of the prosecutor, who argued

12

defendant's threat only referred to Garcia's threat and agreed defendant was not implicated in the shooting. The Attorney General's contention is also completely speculative and is based upon a misreading of the facts. The shooting occurred after the restaurant was closed for the night and, as far as the record reveals, no one was present to be at risk of injury or death. Accordingly, we reject the Attorney General's inconsistent theory of relevance. Even if the theory were sound, it would not negate the trial court's abuse of discretion in failing to exclude the evidence pursuant to Evidence Code section 352.

**4.      Admission of the shooting evidence was prejudicial**

The erroneous admission of evidence of the shooting violated due process for several reasons. First, there were no permissible inferences for the jury to draw from the shooting evidence, and the evidence was inflammatory, especially in light of Solorzano's testimony and the prosecutor's arguments linking the shooting to defendant's threat. Second, admission of that evidence, coupled with the court's instruction permitting the jury to consider the evidence with respect to the fear element of the offense, reduced the prosecution's burden of proof by allowing defendant to be convicted without a finding that his threat caused Solorzano to experience sustained, reasonable fear. In addition, as stated in *Jackson*, *supra*, 254 Cal.App.2d at page 660, the admission of the shooting evidence effectively placed an impossible burden on defendant to prove he was not complicit in the shooting. For all of these reasons, the court's error in admitting the evidence rendered defendant's trial fundamentally unfair. Because admission of the evidence violated due process, the Attorney General has the burden of proving beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824].)

Solorzano testified he believed defendant's threat to kill him "because of the shooting at [Solorzano's] business." Further, he believed defendant was capable of carrying out his threat "because of the shooting to [his] business." Solorzano did not testify that defendant's threat itself, without the shooting, caused him fear. Given the

13

evidence that defendant was intoxicated at the time of the threat, defendant and Solorzano were arguing at the time of the threat, the threat was shouted from afar, defendant had previously argued with Solorzano, and Solorzano had previously insulted defendant and called the police about him, defendant's threat to kill Solorzano could have been viewed as a hyperbolic, angry utterance, not a statement meeting all of the elements of section 422.

Further, the shooting evidence created a substantial risk the jury would conclude defendant was complicit in the shooting, thereby inflaming the jury and potentially causing it to infer defendant was predisposed to committing crimes. The prosecutor's argument exacerbated this risk by effectively linking Garcia's threat, the shooting, and defendant's threat and suggesting they constituted a "pattern of activity." Worse yet, the prosecutor argued the subsequent fire was part of that pattern, and the jury was neither informed defendant was in custody at the time of the fire nor instructed not to consider the fire with respect to defendant's guilt.

The court's limiting instruction increased, not mitigated, the prejudicial effect of the erroneous admission of evidence of the shooting by telling the jury it could consider the shooting to determine the reasonableness of the victim's fear and whether he suffered sustained fear.

For all of these reasons, the admission of the shooting evidence was not harmless beyond a reasonable doubt, and defendant's conviction must be reversed.

**DISPOSITION**

The judgment is reversed.

NOT TO BE PUBLISHED

MILLER, J.*

We concur:

ROTHSCHILD, P. J.

CHANEY, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15