Filed 10/21/13  P. v. McCorckle CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PAUL WAYNE McCORCKLE, JR.,<br><br>Defendant and Appellant. | C070435<br><br>(Super. Ct. No. 10F07247) |

A jury found defendant Paul Wayne McCorkle, Jr., guilty of stalking Carrie H. (Pen. Code, § 646.9, subd. (a); count one),[1] stalking Carrie H. while a restraining order prohibited such conduct (§ 646.9, subd. (b); count two), and possession of ammunition by a convicted felon (§ 12316, subd. (b)(1); count three).  The jury found in connection with count two that a Sacramento Superior Court judge had issued a temporary restraining

---

[1] Undesignated statutory references are to the Penal Code.

1

order on October 22, 2010.  The jury found defendant not guilty of possession of a firearm by a convicted felon.  (§ 12021, subd. (a)(1).)  Defendant was sentenced to prison for the upper term of four years on count two.  Concurrent terms of two years each were imposed on counts one and three.

On appeal, defendant contends there was insufficient evidence that (1) he stalked Carrie, and (2) the restraining order had been in place.  We affirm.

## FACTS

### *Prosecution Case-in-Chief*

Carrie had known defendant since high school.  They began dating eight years later, in 2001, when Carrie already had two children, then six-year-old Maria and three-year-old Steven.  Although defendant was not the biological father of either child, they both considered him a father figure for the seven or eight years that he and their mother were together.  The couple lived together in several places but they never married.

Carrie knew defendant to have a temper, and the two sometimes would yell at one another.  Their problems escalated in 2005 when she thought he was cheating on her.  When she confronted him he choked her, slapped her, and threw her on the ground.  At the time, she did not report the incident to the police because she was not prepared to leave him and did not want to get him in trouble.  Though periodically he would throw things at her or spit in her face, she simply "respected" the fact that he had a "temperament issue."

Between August 2008 and January 2009 Carrie's relationship with defendant became on again, off again.  In 2008 she learned that he was still cheating on her.  She moved out once or twice.

During an incident in January 2009 Carrie left her house overnight.  Defendant told her that if she did not return to the house, he would burn everything she owned.  When she returned home the next morning, she saw that all of her belongings had been

2

dumped into a pile in the bedroom and covered in bleach, gasoline, shampoo, and other toiletries; everything was destroyed.

During an incident in 2009 Carrie asked defendant to leave her apartment. He punched her in the face, blackening both of her eyes, and he choked her until she almost passed out.

Carrie finally considered herself "done" with defendant and moved out for good in March 2009. But after she did so, he started "bullying" her by showing up uninvited and constantly telephoning or texting, wanting to know what she was doing and whom she was with. Sometimes he would barge into her apartment. When she would ask him to leave, he would get violent and say he would not leave unless she got a restraining order.

When the couple initially broke up, Carrie's mother, Livia H., tried to counsel defendant in the hope that he and Carrie might resolve their differences. But defendant never listened and did what he wanted to do. He telephoned Livia constantly, leaving voice mail and text messages. Eventually, Carrie asked Livia to stop responding to the calls and she stopped. But defendant persisted in contacting Livia, often rambling about Carrie and how angry he was with her. In other calls, he claimed to still love Carrie and to want her back. Livia came to believe that defendant did not love Carrie but was obsessed with her and was willing to use the children in order to get her back.

Livia started saving defendant's telephone and text messages after their tone began to change from conciliatory to threatening. One message left on Livia's voice mail said that Carrie needed to marry defendant or die.

Around May 2009 Carrie began to fear for her safety. Nevertheless, she tried to go forward with her life, opening a hair salon with her friends Greg and Chelkee Klovee.[2] Another friend, Sarina Conley, was brought on as manager. The new business became

---

[2] For clarity, we refer to the Klovees by their first names. No disrespect is intended.

3

part of the disagreement with defendant, who seemed to be jealous of it. He remarked that Carrie thought she was a "big shot," or "rich girl," now that she owned her own business and was making her own money.

Defendant would telephone Carrie at work, but she would not answer. He would invite himself to the salon and arrive unannounced, standing there and watching Carrie. Sometimes he would show up late at night as Carrie was leaving work or returning to her mother's house.

On more than one occasion, Greg heard defendant threaten the salon. In April 2010 Carrie obtained a restraining order and had Greg serve it upon defendant. In the parking lot outside the salon, Greg handed defendant the paperwork and told him his ex-girlfriend did not want him coming around. Defendant replied that he would burn the place down with those "bitches" inside it. Defendant also told Greg he would regret having involved himself in defendant's "business" or affairs.

Based on defendant's history, Greg took him seriously. Greg formed the impression that defendant blamed the salon for enabling Carrie to leave him. Greg reported defendant's threats to Chelkee and to Carrie.

In June 2010 after defendant threatened to commit suicide, his parents and sister conducted an "intervention" in which Carrie and her mother participated. Carrie did so in order to help defendant and protect herself. She believed that if he had a gun and continued to use drugs, eventually she would be hurt. In fact, at the intervention he threatened her again and said he had a gun. When his parents asked why he had the gun, he said he was going to kill Carrie and then himself. Carrie was scared because, based on his prior violent behavior toward her, she believed him capable of doing what he said. Defendant's father took possession of some bullets in defendant's backpack, but the interveners did not succeed in obtaining his gun.

The interveners tried to persuade defendant to enter a drug treatment program, but he refused. The intervention ended with Carrie and defendant agreeing to attend

4

counseling on coparenting her children. But Carrie and Livia advised defendant and his family that the counseling would not restore the former romantic relationship. Once defendant understood that counseling would not get Carrie back, he no longer was interested in it.

A few hours after the intervention, defendant sent Carrie a message that contained an image of a box of ammunition on a store shelf and stated he "was buying more." The message scared Carrie because she believed defendant still had a weapon he could use to harm her or himself.

During the summer and fall of 2010 defendant continued to bombard Carrie's family with telephone calls and text messages. He sometimes sent Carrie 20 to 50 messages a day. Changing her telephone number did not help, because defendant became "irate" when he could not reach her. He sent a message via Livia and his sister that if Carrie did not call him, things "were going to get out of hand." On a daily basis, defendant sent voice mails to Livia, who in turn played them for Carrie. In some, defendant said he loved and missed her and the kids. In others, he said he hated her, called her derogatory names, and threatened to kill her.

In one message sent to Livia's telephone, defendant said that Carrie had better call him and "fix this before things get out of hand." He warned that if she did not, she had better not set foot in her salon because he could "make [their] lives hell" and "make [their] lives worse than [they] could imagine." The message frightened Carrie because they had been having problems at the salon.

On one occasion, three unknown males had entered the salon under the pretense of seeking hair services. The men left, but minutes later they returned and started breaking and throwing things in the salon. One man threw a five-gallon water jug at Carrie. The men said nothing during the vandalism and were "ju[s]t kind of laughing."

The day after defendant left the message about Carrie not setting foot in the salon, two unknown women entered and asked Chelkee about services. While Chelkee

5

retrieved a business card for the women, one of them sucker-punched Chelkee and ran out of the salon. The duo fled to a waiting car, where a man stood yelling for them to hurry and get in. After this incident, some of Carrie's employees quit working at the salon because they were scared to be there.

Defendant sent letters to Carrie and her children. One letter frightened Carrie with its reference to a song, "Love the Way You Lie," by Eminem and Rihanna. The song involves a man who is trying to get his ex-girlfriend to take him back. Carrie testified that in the song, the man threatens he will not let the woman "keep leaving and breathing and he'll burn the house down."

In the summer of 2010 defendant drove Carrie's son Steven to a shopping mall. When Steven entered defendant's car, he had to step over a bat-shaped object that was covered with a towel. Steven lifted the towel and saw that the object was a rifle he previously had seen in defendant's father's gun rack. Steven asked defendant why he had it, and defendant replied that he was "going hunting." When Steven asked what he was hunting for, defendant said he was going to shoot Carrie and her two friends from the salon. The statement made Steven "[k]ind of scared" and "nervous" because he did not know whether defendant was serious. Steven previously had heard defendant threaten to shoot Carrie and kill her. The prior threats made the present threat more frightening. As the two continued to the shopping mall, Steven noticed a box of ammunition in the car's cup holder. He asked whether the ammunition was for the rifle in the car. He did not recall defendant's response. After this incident, Steven stopped considering defendant to be his dad.

Steven did not tell anyone about defendant's threats right away, but he continued to think about them. A couple of weeks later, some people came to his mother's salon and broke things. In light of that incident and other attacks on the salon, Steven became "really scared" and wondered whether defendant had meant what he said. Steven finally told Carrie what defendant had said in the car.

Carrie was both angered and scared by defendant's voicing to Steven a threat against Carrie and her friends. She was angry that defendant would scare Steven, and she was fearful that defendant might act upon his threat. She took his statements as a credible threat.

Some time after Carrie learned of defendant's statements to Steven, another incident occurred at the salon. Around October 15, 2010, someone apparently tried to start a fire at the salon. Carrie smelled gasoline when she arrived for work that morning. An arson investigator found a hole in the roof through which gasoline had been poured and burning objects, such as shop towels and shoelaces, had been dropped. On the ground near the hole in the roof was a ladder that ordinarily was kept on the other side of the building.

About a week after the attempted arson, Carrie saw three bullet holes in the window of the salon's break room. Carrie believed the damage had been done at night because no one at the salon had heard anything during the work day.

The arson incident prompted Carrie to apply for another temporary restraining order, which she obtained on October 22, 2010. The order listed as protected persons Carrie, her mother, and her children. Although she knew that someone from the Sheriff's Department could serve the restraining order without charge, Carrie asked Greg to serve the papers on defendant. That same day, Greg served the papers on defendant in the parking lot of the apartment complex where defendant's parents lived. Greg also filled out papers as proof of his having served the papers upon defendant.

Service of the April 2010 restraining order evidently had caused defendant to leave Carrie alone for a while. Service of the October 2010 restraining order did not have the same effect. Defendant continued to contact Carrie's family repeatedly after that order was served. Almost every day, he left so many telephone messages that the voice mailbox would be full. The subject of the messages was Carrie and her children.

7

Specifically, the messages said that Carrie was not raising the children right; defendant missed the children; and he wanted to see them.

Defendant's mother sent Carrie's daughter Maria a message accusing Carrie of abandoning the family and being unfair to defendant. In response, Maria sent defendant's mother a message that defended Carrie. Maria said that Carrie was a good mother who did not deserve to be treated in the manner in which defendant and his family had treated her. Maria refused to have any connection to the people who had put Carrie through what she had been through.

Although Maria had not used any foul language in her response, defendant took offense to what she had said. On October 27, 2010, defendant called Livia's home telephone and left a message for Maria. The message, which Maria interpreted as threatening, frightened her and made her cry. Still crying, she telephoned Carrie at work to tell her what defendant had said. Carrie called the police, who came out and listened to defendant's messages.

Citrus Heights Police Officer Michael Dutch responded to Livia's residence to investigate the reported violation of the restraining order. After Officer Dutch was unable to locate the restraining order in his computer system, Carrie showed him her copy of the proof of service and her paperwork. Then he listened to and recorded messages on Livia's telephone that Carrie and Maria identified as having come from defendant. Some of the messages had been received that day and others had been received on previous occasions. Officer Dutch photographed some text messages that defendant had sent to Livia's telephone.

Citrus Heights Police Detective Nicole Garing investigated domestic violence cases. On November 3, 2010, she spoke with Carrie, who related a history of her relationship with defendant. Carrie also explained about the problems at her salon.

After speaking with Carrie, Detective Garing went to the apartment where defendant resided with his parents. She found a pile of defendant's personal belongings

8

in a corner of the dining room. She also found a two-pack container of white shoelaces with one pair missing. In the parents' bedroom she found a number of rifles and guns in a cabinet. Also found was a can of .22-caliber pellets.

Defendant's car was searched. In the front passenger seat, officers found a backpack containing two black beanie caps. Also in the front passenger seat was an air-powered pellet gun. A container of .177-caliber pellets for the gun was found below the dash. A second can containing .22-caliber pellets was found next to it. Also in the car was an air rifle. On the floorboard of the driver's side was a black ski cap with a hole cut in the middle. A single 6.35-millimeter bullet, the equivalent of a .25-caliber round, was found in the ashtray. As a convicted felon, defendant was not allowed to have any ammunition.

### *Defense*

Defendant rested without presenting evidence or testimony.

## DISCUSSION

## I

### *Sufficient Evidence of Stalking*

Defendant contends there was insufficient evidence to convict him of either count of stalking Carrie. Specifically, he claims his activities are not within the statutory definition of stalking because they "had a legitimate purpose, which was to get his family back together." We disagree.

"In considering a challenge to the sufficiency of the evidence . . . , we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted

simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).)

Section 646.9, the stalking statute under which defendant was convicted, addresses two distinct behaviors: (1) willful, malicious, and repeated following; and (2) willful, malicious harassment. (*People v. Heilman* (1994) 25 Cal.App.4th 391, 399.) As the parties recognize, this case proceeded on a "harassment" theory rather than a "following" theory.

Section 646.9 defines harassment as engaging in "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and *that serves no legitimate purpose*." (§ 646.9, subd. (e), italics added.) This harassment must place the victim in reasonable fear for her safety or that of her immediate family. (§ 646.9, subds. (a), (g) ["cause the person . . . to reasonably fear"].) The statute does not require that the defendant intend to carry out the threat. (*People v. Falck* (1997) 52 Cal.App.4th 287, 295.)

Defendant claims the evidence of stalking was insufficient as a matter of law. He argues his "intent to try to restore his family certainly qualifies as 'legitimate' purposes which would bar the applicability of section 646.9. Therefore, the prosecution failed to prove the 'harasses' element of section 646.9." As the People note, this argument was rejected in *People v. Tran* (1996) 47 Cal.App.4th 253, 260 (*Tran*).

*Tran* reasoned: "Here, defendant suggests that the phrase 'serves no legitimate purpose' has no definite meaning and thus allows the jurors to impose their own moral judgment on his actions, which he may have believed had a legitimate purpose, i.e., to convince [the victim] to leave her husband and pursue a romantic relationship with him. However, he lifts the phrase entirely out of context and attempts to focus on his view of his activities rather than the view of the victim or a reasonable person. The statute

10

prohibits following or harassing a person and making a credible threat with intent to place the person in reasonable fear of personal or family safety. Harassing is willful conduct that seriously alarms, annoys, torments or terrorizes the person and reasonably causes substantial emotional distress. Defendant cannot genuinely question that his acts of threatening [the victim] with a knife or hammer and chasing her husband and baby while wielding a long knife are prohibited, even if he somehow hopes the acts will persuade [the victim] to leave her husband." (*Tran, supra,* 47 Cal.App.4th at p. 260.)

Defendant replies that *Tran* defined " 'serves no legitimate purpose' in a narrow manner not contained in the statute, requiring the [*sic*] both the ends and the means leading to the 'legitimate purpose' to be objectively reasonable. [Citation.] Here it is obvious that [defendant's] ends are certainly legitimate under any objective standard, *although his means are not*." (Italics added.)

But defendant's construction of "serves no legitimate purpose" is itself too narrow, albeit in a different respect. Every word, phrase, and sentence in a statute should, if possible, be given significance. (*People v. Cobb* (2010) 48 Cal.4th 243, 253.) Thus, significance should be given to the word "serves" as well as the phrase "legitimate purpose." (§ 646.9, subd. (e).) Defendant does not claim, and the evidence does not suggest, his illegitimate means *served,* as opposed to disserved, the end or legitimate purpose of reuniting his family. Defendant claims his actions "*had* a legitimate purpose," but tellingly, he does not attempt to show how his harassing and terrifying behavior could possibly have *served* or furthered that purpose. (Italics added.) Any such contention is forfeited. (E.g., *People v. Harper* (2000) 82 Cal.App.4th 1413, 1419, fn. 4 (*Harper*).)

In any event, it is inconceivable how defendant's acts, such as telling his parents he was going to kill Carrie and then himself, informing Carrie that he "was buying more" ammunition, calling Livia and threatening to kill Carrie, telling Livia that Carrie had better not set foot in her salon, referring to a song in which a man threatens to burn down the house, and telling Carrie's son that he was going to shoot Carrie and her friends from

11

the salon, could possibly have served or been the means to his end or purpose of reuniting his family.

"A court should not lightly adopt an interpretation of statutory language that renders the language useless in many of the cases it was intended to govern." (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 354.)  An interpretation that attaches insufficient significance to the word "serves" renders section 646.9 useless in many cases because it allows a former romantic partner to engage in all sorts of harassing—and counterproductive—behavior simply by claiming that restoring the former relationship is somehow "legitimate."  We decline to adopt this interpretation.

There was overwhelming evidence that defendant engaged in a knowing and willful course of conduct, directed specifically at Carrie, that seriously alarmed, annoyed, tormented, or terrorized her.  (§ 646.9, subd. (e); *Albillar*, *supra*, 51 Cal.4th at pp. 59-60.)  Even if defendant's conduct was for the purpose of reuniting his family, and even if reuniting a family is a legitimate purpose within the meaning of the statute, there was *no* evidence that defendant's actions *served that purpose*.  Thus, his convictions in counts one and two are supported by substantial evidence of stalking.  (*Ibid.*)

## II

### *Sufficient Evidence the Restraining Order was in Effect*

Defendant contends there was insufficient evidence to convict him of stalking Carrie while the restraining order was in place.  Specifically, he claims the evidence fails to show he had been lawfully served with the order purportedly in effect when he harassed Carrie and her family after October 22, 2010.  Thus, even if there was sufficient evidence of stalking for purposes of count one, he claims his count two conviction must be reversed.  We disagree.

*Background*

Greg Klovee testified that in October 2010 Carrie asked him to serve a restraining order on defendant. Greg testified that he served defendant on October 22, 2010, at the parking lot of defendant's residence.

At trial, Greg identified People's exhibit 15 as "the restraining order paperwork that was filled out." Greg identified People's exhibit 16 as "[t]he proof of service that [he] filled out after serving [defendant] the restraining order."

People's exhibit 15 contains several documents for different court dates: a notice of court hearing (Judicial Council Forms, form DV-109) with a superior court file stamp of October 22, 2010; a temporary restraining order (Judicial Council Forms, form DV-110) with a file stamp of the same date; a request for order (Judicial Council Forms, form DV-l00) with a file stamp of the same date; a description of abuse (Judicial Council Forms, form DV-101), unstamped but with a checked box indicating "This form is attached to DV-100"; an unstamped domestic violence packet attachment (Sacramento Superior Court Forms, form FL/E-LP-613); a restraining order after hearing (Judicial Council Forms, form DV-130) with a file stamp of November 9, 2010; a request and order for free service of restraining order (Sacramento Superior Court Forms, form FL/E-LP-635) with a file stamp of October 22, 2010; a minute order for November 9, 2010; and an application for domestic violence restraining order (Sacramento Superior Court Forms, form FL\E-LP-640) with a file stamp of October 22, 2010.

People's exhibit 16 is an unstamped proof of service (in person) (Judicial Council Forms, form DV-200) signed by Greg and dated October 22, 2010. The form includes boxes to be checked by the server to indicate the forms that have been served. On the form, Greg checked the box for "DV-109 with DV-100 and a blank DV-120 (*Notice of Court Hearing; Request for Order*; blank *Answer to Temporary Restraining Order*)," but he did not check the box for "DV-110 (*Temporary Restraining Order*)."

13

*Analysis*

In the trial court, the parties disputed whether the Judicial Council Forms, form DV-110, temporary restraining order dated October 22, 2010, was valid. On appeal, defendant notes that Officer Dutch had been unable to locate the restraining order in his computer system. But defendant has not argued or attempted to show that Officer Dutch's inability was caused by an infirmity in the order, as opposed to a malfunction in his system. Defendant has forfeited any contention that the order is not valid. (*Harper*, *supra*, 82 Cal.App.4th at p. 1419, fn. 4.) In any event, nothing in the record affirmatively suggests any infirmity in the order.

We next consider defendant's claim that there was insufficient evidence that Greg *served* him the valid restraining order. In his opening brief, defendant claimed (perhaps inartfully) that Greg testified he had served "the packet of court documents relating to a domestic violence restraining order contained in People's Exhibit No. 15." In his reply brief, defendant notes that Greg "treated the packet as a whole and he did not point specifically to the restraining order as one of the documents that was included in the packet."

We do not read Greg's testimony as suggesting he served *the entire contents* of People's exhibit 15 upon defendant. Greg testified that People's exhibit 15 "appears to be . . . the restraining order paperwork that was filled out." But the exhibit contains several documents, some of which had not been in existence when defendant was served on October 22, 2010. Thus, Greg's remark does not establish that he handed defendant the *entire* exhibit, *necessarily* including the temporary restraining order.

Nor can Greg's proof of service (People's exh. 16) be construed to mean he served defendant the temporary restraining order. Greg checked the box indicating he had served the Judicial Council Forms, forms DV-109 (notice of court hearing), DV-100 (request for order), and DV-120 (blank answer to temporary restraining order). However,

14

Greg did not check the box indicating he had served the Judicial Council Form, form DV-110 (temporary restraining order) itself.

Nevertheless, Greg testified that he served "the October 22nd restraining order" upon defendant at what he "knew to be his apartment complex." Greg's proof of service and his trial testimony are in conflict, and the jury impliedly resolved the conflict in favor of the trial testimony. On appeal, this reviewing court neither reweighs this evidence nor reevaluates Greg's credibility. (*Albillar*, *supra*, 51 Cal.4th at pp. 59-60.) The circumstances reasonably justify the jury's findings, and reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*Ibid*.) Because the jury could find that defendant received the actual restraining order, his claim that "there was insufficient evidence to show" he "had notice of the actual terms of that order which due process requires" has no merit.

In any event, defendant admitted that he had received the restraining order. In an October 27, 2010, call to Livia's telephone, he acknowledged that he was not allowed to call or come over to the house. In so many words, he admitted that he was subject to a restraining order. The call was played for the jury. Nothing in the appellate record suggests defendant was referring to the April 2010 restraining order rather than the October 2010 order. Defendant's count two conviction is supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.

                                     RAYE           , P. J.

We concur:

         HULL         , J.

         BUTZ         , J.